| MARVIN EARL WILLIAMS, JR. | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| GERALD BRANKER, Warden, | ) |
| Central Prison, Raleigh, | ) |
| North Carolina, | ) |
| | ) |
| Respondent. | ) |

ORDER

This matter arises from the petition for writ of habeas corpus [DE -9], pursuant to 28 U.S.C. § 2254, filed by Marvin Earl Williams, Jr. ("Williams" or "Petitioner"). Petitioner is a state inmate convicted of "first-degree murder . . . burglary with explosives and attempted safecracking." State v. Williams, 339 N.C. 1, 12, 452 S.E.2d 245, 252 (N.C. 1994). Presently before the court is Respondent's motion for summary judgment [DE-10]. For the following reasons, the court orders that Respondent's motion for summary judgment is ALLOWED, and the petition is DISMISSED.

## STATEMENT OF THE CASE

I.    Background

Williams was convicted on June 4, 1990, in the Superior Court of Wayne County. Pet. [DE-9], p. 5. The following summary of the evidence presented at his trial is taken from the initial opinion of the North Carolina Supreme Court in State v. Williams, 334 N.C. 440, 434 S.E.2d 588 (N.C. 1993), cert. granted, judg. vac. by North Carolina v. Bryant, 511 U.S. 1001 (1994):

In the early morning of 12 February 1989, Lewis Rich, a security guard for Dewey Brothers, Inc., arrived at the company's premises for his 12:30 a.m. to 6:30 a.m. shift

to find the guardhouse gate locked. Unable to enter the premises or locate Theron Price, the guard he was scheduled to relieve, Rich telephoned Richard Helms, the company president. Helms arrived shortly and opened the gate. Helms found the door to the payroll office partially open, a light emanating from within, and just outside the office door an acetylene torch and a cart bearing oxygen and acetylene tanks. Helms then summoned the police. Inside the payroll office, the police observed a floor safe illuminated by a gooseneck lamp. There was carbon on the safe's hinges and knob. The police determined that the torch was improperly adjusted, that it would have created a lot of smoke and carbon but would not have cut metal.

Joining the police in a search of the rest of the premises, Helms discovered Theron Price. Lifeless, Price was lying on his back in the steel shed next to the payroll office, and had blood on his face and head. Parallel lines in the dirt indicated he had been dragged into the shed. Various of his possessions, including his time clock, were nearby, as were a yellow hard hat and a welder's mask. The time clock, hard hat and welder's mask had blood on them. There were cracks in the fiberglass of the welder's mask, and, in the cracks, gray hairs. Also found on the scene were Reebok tennis shoe impressions leading to the building which housed the acetylene torches and related equipment. The lock on the cabinet where the torches were kept had been cut off.

Several days after the discovery of Price's body, an employee of Dewey Brothers named Angelo Farmer reported to his supervisors that he knew the identity of the killer. According to Farmer, he and defendant had discussed breaking into Dewey Brothers and robbing its safe in the early part of February. On 11 February, defendant asked Farmer whether he was "ready to move." When Farmer indicated that he was not, defendant said, "I'm gone. I'm on my move." The next day, after learning of Price's death, Farmer confronted defendant, saying: "Damn man. You killed a man." Defendant said he did not mean to do it. When Farmer remarked that defendant could have tied Price up, defendant replied that he had wanted to but "the man kept coming."

Having revealed this information, Farmer agreed to cooperate with the police. The police furnished him with a tape recording device. Wearing the device, Farmer engaged defendant in conversation about the crimes. During the conversation, defendant said he had tried to break into Dewey Brothers' safe using an acetylene torch he found on the premises. When surprised by the watchman, he had pulled a knife but the guard had "kept coming." He had then taken the guard's time clock and hit him with it "two or three times." Defendant further stated: "I got scared then, but then I thought about the money. I kept checking on him and he had not come back to. I knew I had done killed the m----- f----- then." Defendant had continued to work on the safe and had checked on the guard more than once. When he heard a truck pull up, and later a car, defendant had attempted to wipe away his fingerprints and hide

2

some of the evidence, and had then fled.

The police obtained a warrant based on Farmer's allegations and the tape recording and arrested defendant at a boarding house called the Salem Lodge. The police seized defendant's clothing and some of his possessions. The shoes he was wearing matched the footprints found at Dewey Brothers. Other than the shoes, however, the police obtained no physical evidence tending to link defendant to the crime scene.

An autopsy of the victim's body revealed several wounds on the face and head caused by blunt force trauma and a small laceration on each hand. The wounds on the face would have caused mild to moderate pain. The wounds on the head resulted in skull fractures and could have caused death. Two of these wounds would have required the force of a five-pound steel ball dropped from seven to twelve feet. The victim may have been conscious during the infliction of all the wounds, and for two to five minutes thereafter, and may have been hit while lying on the ground. The victim probably lived for five to ten minutes after the fatal blows were struck.

Defendant was convicted of first-degree murder on theories of felony murder, the underlying felony being burglary with explosives, and premeditation and deliberation. He was also convicted of burglary with explosives and attempted safe-cracking. After a sentencing hearing, the jury recommended and the trial court imposed a sentence of death. The trial court also sentenced defendant to thirty years' imprisonment on the burglary conviction, but arrested the attempted safe-cracking judgment.

Williams, 334 N.C. at 444-46, 434 S.E.2d at 590-91.

II.    Procedural History

On direct appeal the North Carolina Supreme Court determined that "the trial judge gave the jury an unconstitutional instruction on the meaning of 'reasonable doubt'" and therefore ordered that Petitioner be afforded a new trial. Id. at 446, 434 S.E.2d at 591. The United States Supreme Court granted North Carolina's petition for certiorari review and vacated and remanded to the North Carolina Supreme Court "for further consideration in light of Victor v. Nebraska, 511 U.S. 1 (1994)." North Carolina v. Bryant, 511 U.S. 1001 (1994). On remand, the North Carolina Supreme Court found no error and affirmed Petitioner's conviction and sentence. State v. Williams, 339 N.C.

3

1, 452 S.E.2d 245 (N.C. 1994), cert. denied, 516 U.S. 833 (1995).

On July 3, 1996, Petitioner filed a motion for appropriate relief ("MAR") in the Superior Court of Wayne County. Resp't. Ex. M. The state court did not conduct an evidentiary hearing before issuing an order summarily denying the MAR on May 22, 1997. Resp't. Ex. O. Petitioner thereafter filed a petition for certiorari review with the North Carolina Supreme Court, which was denied. Resp't. Ex. P; Resp't. Ex. R. On March 5, 1999, Petitioner filed his initial federal petition for writ of habeas corpus [DE-4]. On April 7, 1999, Petitioner filed his corrected petition [DE-9]. Also on April 7, 1999, Respondent filed his answer to the petition and motion for summary judgment [DE-10]. On March 21, 2002, the court entered an order [DE-29] granting Petitioner's motion to stay federal habeas proceedings while he prosecuted a MAR in the state courts pursuant to N.C. Gen. Stat. § 15A-2006. On February 2, 2012, the Superior Court of Wayne County issued its ruling on Petitioner's MAR, finding that at the time he committed the offenses for which he was convicted he was "mentally retarded as defined by N.C. Gen. Stat. § 15A-2005(a)(1)[.]" Resp't. Am. Answer [DE-53], pp. 3-4. Therefore, Petitioner's death sentence was vacated and a life sentence was imposed. Id. The State did not appeal. Id.

The parties have filed additional briefing [DE-53, 54, 57, 58] and agree Petitioner's claims pertaining to his death sentence are moot[1] and should be dismissed. Accordingly, the matter is now ripe for ruling.

## DISCUSSION

I.      Standard of Review

---

[1] Specifically, the parties agree that Petitioner's claims IV(C), IV(D), X, XI, XII, XIII, and XV are moot. [DE-53, 54]. Accordingly, those claims are DISMISSED.

4

A. Summary Judgment

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp, 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B. Section 2254(d)

The court's review of Petitioner's claims is governed by 28 U.S.C. § 2254(d), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104, 132, 110 Stat. 1214 (1996). Section 2254(d) provides as follows:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions

5

as of the time of the relevant state-court decisions." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412-13. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Likewise, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 300 (2010). See also Winston v. Kelly, 592 F.3d 535, 554 (4th Cir. 2010) ("For a state court's factual determination to be unreasonable under § 2254(d)(2), it must be more than merely incorrect or erroneous. It must be sufficiently against the weight of the evidence that it is objectively unreasonable.") (citing Schriro v. Landrigan, 550 U.S. 465, 474 (2007)). Thus, while "deference [in the habeas context] does not imply abandonment or abdication of judicial review" and does not "preclude relief," Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), the deferential standard imposed by § 2254(d), as to both legal conclusions and factual determinations

6

by the state courts, erects a substantial bar for state inmates seeking habeas relief in federal court.[2]

The statute "does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one." Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000). If the state court did not articulate the rationale underlying its adjudication, a federal habeas court must examine the record and the clearly established Supreme Court precedent to determine whether the state court's adjudication was contrary to, or involved an unreasonable application of, clearly established federal law. Id. at 158. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, _ U.S. _, 131 S.Ct. 770, 784-85 (2011). Finally, the factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). The

---

[2] In this vein, the Supreme Court has observed:

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no probability fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. Jackson v. Virginia, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, _ U.S. _, 131 S.Ct. 770, 786-87 (2011).

petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Fisher v. Lee, 215 F.3d 438, 445 (4th Cir. 2000).

Only after a petitioner establishes that the state court's adjudication of his claims was "contrary to" or an "unreasonable application of" clearly established federal law, or was "based on an unreasonable determination of the facts in light of the evidence," may a federal court proceed to review a state court judgment independently to determine whether habeas relief is warranted. Rose v. Lee, 252 F.3d 676, 689-90 (4th Cir. 2001); see also Frazer v. South Carolina, 430 F.3d 696, 718 (4th Cir. 2005) ("Because the state court's decision in this case was both contrary to and involved an unreasonable application of clearly established federal law, the district court properly reviewed Frazier's claim *de novo*."); Lynch v. Polk, 204 F. App'x 167, 170 (4th Cir. 2006) (unpublished decision) ("If a legal or factual error of the degree specified in § 2254(d)(1) or (d)(2) occurred, then a federal court has the obligation to conduct an independent review of the petitioner's claims to determine whether the issuance of a writ is warranted.").

II.     Petitioner's Claims

The following claims from the petition have not been rendered moot by the vacatur of Petitioner's death sentence and are therefore before the court for decision:

I. The Trial Court's Denial of the Petitioner's Request to Proceed Pro Se Violated the Petitioner's Right to Proceed Pro Se Pursuant to the Sixth and Fourteenth Amendments to the United States Constitution.

II. The Trial Court's Conduct of an In-Chambers Conference with the Prosecutor and the Defendant's Court Appointed Counsel on the issue of Whether to Grant the Defendant's Faretta Motion, in the Absence of the Defendant, Violated the Defendant's Right to be Present at all Stages of His Capital Case Pursuant to the Sixth and Fourteenth Amendments to the United States Constitution.

III. The Petitioner's Conviction Was Obtained in Violation of His Right to a Fair and

8

Impartial Jury as Guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution Where During Deliberations on the Defendant's Guilt or Innocence One Juror Sent a Note Out Stating That She Wished to be Excused Because She Feared Her Impartiality Might be Compromised by Her Personal Relationship with One of the Petitioner's Lawyers, but the Trial Court Made No Inquiry About the Relationship, the Lawyer in Question Asked that the Court Make No Inquiry, and The Court Refused the Juror's Request on the Ground That It Would Necessitate Mistrial and Losing Five Weeks of Trial Time.

IV.     The Petitioner was Denied Effective Assistance of Trial Counsel Because[:]

A. Defendant's trial counsel failed to request a hearing or other opportunity to determine the import of the message from juror Teresa Smith.

B. Defendant's counsel failed to object at trial to the admission of certain highly prejudicial testimony, where the testimony was clearly inadmissible . . .

E. Defendant's trial counsel failed to move for a mistrial or object upon the trial Court's improperly advising the jury that "five weeks would go down the drain" if a mistrial were declared because of juror Smith's revelation.

V. The Petitioner's Conviction was Obtained in Violation of his Right to Due Process of Law as Guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution Where the Trial Court Gave an Instruction on Reasonable Doubt Which Unconstitutionally Reduced the State's Burden of Proof Below the Standard Set Forth in In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 LEd 2d 368. (1970)

VI. The Petitioner's Conviction was Obtained in Violation of His Right to Due Process of Law as Guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution Where the Trial Court Denied the Petitioner's Objections to the State's Exercise of its Peremptory Challenges in a Racially Discriminatory manner.

VII. The Petitioner's Conviction was Obtained in Violation of his Right to a Fair and Impartial Jury and to Due Process as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution Where the Prosecutor Unconstitutionally Injected Race into the Jury Selection Process by Repeatedly Drawing the Jurors['] Attention to the Fact that the Defendant was a Young Black Man and the Victim Was an Elderly White Man.

9

VIII. The Petitioner's Conviction was Obtained in Violation of His Right to a Fair and Impartial Jury and to Due Process as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution Where the Prosecutor Unconstitutionally Exercised Peremptory Challenges to Exclude Jurors Who Could and Would Follow the Law but Were Not Enthusiastic Supporters of the Death Penalty Solely Because of Such Jurors' Reservations as to the Application of the Death Penalty, and By Continuously Indicating to Jurors That They Would Have a Duty to Vote for Death.

IX. The Trial Court Erred by Denying the Petitioner's Motion to Suppress Evidence Obtained as a Result of a Violation of the Petitioner's Fifth Amendment [Right] Against Self Incrimination Where Certain Items Were Identified as Belonging to the Defendant by Way of the Defendant's Answer to a Question Asked After the Defendant had been Advised of his Miranda Rights and Had Responded to the Preliminary Question of Whether He Would Waive These by Standing Mute.

XIV. The Trial Court [Erred] in Resolving the Petitioner's Motion for Appropriate Relief [and] Denied the Petitioner Due Process by Deciding Contested Issues of Fact Summarily Without Affording Petitioner an Evidentiary Hearing, and by Concluding Incorrectly That a Number of Issues Raised in the Motion Were Procedurally Barred.

Pet. [DE-9], pp. 6, 10, 12, 15, 17, 18, 20, 25, 26, 28, 29, 40, 42, 43, 51, 60.

III.    Analysis

Respondent concedes that, with the exception of Claim III, "Williams has exhausted state remedies in satisfaction of the exhaustion requirement of 28 U.S.C. § 2254(c) and (d)." Resp't. Mot. Summ. J. [DE-10], p. 15. With regard to Claim III, Respondent waives exhaustion.[3] Id. Thus, in accordance with 28 U.S.C. § 2254(d), this court must determine whether the state court's adjudication of Petitioner's claims was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts adduced in state court. The court will consider each claim in-turn.

A.    Claim I

---

[3]    Although Respondent waives exhaustion regarding Claim III, he nonetheless argues that the claim is procedurally barred. Resp't. Mot. Summ. J. [DE-10], pp. 19-21.

Petitioner claims that his constitutional rights were violated when the trial court refused to allow him to represent himself at trial. The North Carolina Supreme Court addressed this claim in its first opinion on direct appeal.

> Defendant next contends that he was denied the right to represent himself. Based on the record summarized below, we find that defendant did not request to proceed pro se with sufficient clarity. Because the right was not properly asserted, it cannot have been infringed.

> On the afternoon of the fourth day of jury selection, defendant informed the judge that he was dissatisfied with his court-appointed counsel, Messrs. Jordan and Braswell. Defendant indicated that his lawyers had not adequately communicated with him about the details of his case, and had failed to provide him with the information (including legal texts) he needed to help defend himself. He also suggested that his case should have been moved to another venue because of negative pretrial publicity. The judge responded that defendant's lawyers were perfectly capable and that it would be impractical at this late stage of the proceedings to substitute other counsel. According to the judge, defendant had only two options. He could either continue with Messrs. Jordan and Braswell, or represent himself. When asked if he wanted to represent himself, defendant answered, "No, sir." The judge reiterated that defendant's lawyers would provide an "adequate defense," and then questioned the lawyers about their representation of defendant.

> After his lawyers had spoken, defendant again addressed the court. He said, "You stated that, that there is no other way that I could have no other lawyers ... But what if I choose to represent myself?" The judge responded that he would consider defendant's request and proceeded to question him at great length regarding his ability to conduct his own defense. Specifically, the judge asked whether defendant was taking drugs or medication, how much schooling he had completed, what his grades had been and whether he had ever studied law. The judge then advised defendant that, given his lack of legal training, he would be at a grave disadvantage in attempting to represent himself against a prosecutor with 25 years experience. The judge concluded by asking defendant whether he still wished to represent himself. Defendant responded: "I choose to represent myself." The judge did not rule on defendant's request, but instead adjourned the court so that he could consider the issue for the rest of the afternoon.

> The judge opened the next session with another lecture on the dangers of self-representation. The judge reminded defendant that he faced a number of serious charges, including one for first degree murder, and that he risked receiving the death penalty. The judge then asked defendant again whether he still wanted to represent

himself. Defendant responded, "I chose to represent myself." At this, the judge took a brief recess and then renewed his questioning regarding defendant's ability to represent himself. This time the judge went into greater depth regarding defendant's education and grades, and also asked about defendant's age, IQ, public speaking ability and previous experience in representing himself. The following exchange then occurred.

MR. WILLIAMS: I understand the situation that I have chosen to represent myself. It is not that I would like to represent myself but if I could get a full new complete set of lawyers representing me and I would feel fair with that representation. I would like to continue on with my trial if I was able to receive things that I am entitled to have concerning my trial or evidence that is brought up against me and so on, state witnesses and so on.

THE COURT: You are saying that if your lawyers would furnish to you everything that you ask for—

MR. WILLIAMS: Concerning my trial.

THE COURT: Then you would be willing to let them stay on your case?

MR. WILLIAMS: Yes, sir.

The discussion then turned to the materials defendant wished to receive. The judge assured defendant that he would order the lawyers to furnish defendant with everything he required, and then said: "Let's try it for a few days and see how things go. I don't want you to represent yourself. I just don't—I think that would be unfair." Defendant did not appear reassured. When asked what was on his mind, defendant responded, "I was thinking of I want to get the right representation from my lawyers concerning this matter." The judge then indicated that he would require defendant's lawyers to stay on the case, and denied defendant's motion "to represent himself in the trial of this case," citing the following factors: 1) that defendant was charged with serious crimes for which he could receive the death penalty or life imprisonment, 2) that defendant was twenty-eight years old and had completed only 10 years of education, 3) that defendant had an IQ of 78, "borderline range of intellectual functioning," 4) that Messrs. Braswell and Jordan were competent, experienced attorneys, and 5) that defendant had no access to "law books" in prison and was incapable of retaining a private attorney. The judge concluded "as a matter of law" that defendant was "incapable of adequately representing himself in the trial of his case."

At the outset, we note that the trial court based its ruling on erroneous grounds. A defendant's right to represent himself, guaranteed in state criminal proceedings by the

12

Sixth and Fourteenth Amendments of the United States Constitution,[1] does not depend on his ability to present an effective defense. Faretta v. California, 422 U.S. 806, 834 (1975). The right protects individual free choice and therefore must be honored even though its exercise may undermine the objective fairness of a proceeding. As stated in Faretta, "although [the defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the life-blood of the law.' " Id. (quoting Illinois v. Allen, 397 U.S. 337, 350–51 (Brennan, J., concurring) (1970)). Under Faretta, a defendant who clearly elects to represent himself must be permitted to do so upon the sole condition that he make a knowing and voluntary waiver of the right to counsel. Id., 422 U.S. at 835. Nor does a defendant need the skill of a lawyer to knowingly waive counsel. Such a waiver will be found if the defendant has been made aware of the benefits of counsel and understands the consequences of foregoing those benefits. Id.; see also N.C.G.S. § 15A–1242.

FN1. In North Carolina, the right of self-representation is also guaranteed by Article I, Section 23 of the North Carolina Constitution, State v. Mems, 281 N.C. 658, 670–72, 190 S.E.2d 164, 172–73 (1972), and by statute, N.C.G.S. § 15A–1242.

Despite the trial court's erroneous reasoning, we find no error in its ruling since Mr. Williams never clearly asserted his right to proceed pro se. Unlike the right to counsel, the Faretta right does not arise until asserted. Brown v. Wainwright, 665 F.2d 607, 610 (5th Cir.1982). To properly assert the right, the defendant must "clearly and unequivocally" request to represent himself. Faretta, 422 U.S. at 835; see also State v. Thomas, 331 N.C. 671, 673, 417 S.E.2d 473, 475 (1992). As explained by the court in Meeks v. Craven, 482 F.2d 465 (9th Cir.1973), this rule is required to prevent defendants from manipulating trial courts by recording an equivocal request at trial and then arguing on appeal, as appropriate, either that they have been denied the right to represent themselves or that they did not make a knowing waiver and have therefore been denied the right to counsel. 482 F.2d at 467–68. To prevent such gamesmanship, we refuse to find an assertion of the Faretta right if the defendant's statements or actions create any ambiguity as to his desire to represent himself.

In Meeks, the seminal case on this issue, the defendant requested to proceed pro se in order to present a motion his counsel had advised against. The defendant was permitted to present his motion, after which the court asked him whether he wanted to continue representing himself. The defendant replied, " 'Yes, Your Honor, I think I will.'" The Ninth Circuit held that Meeks had never asserted his right to represent himself because his conduct, viewed as a whole, indicated a desire only to present a single motion. The court reasoned further that the statement, " 'I think I will,' " was a "prototype of equivocation." Id. at 467.

13

North Carolina courts have been equally strict in scrutinizing alleged requests to proceed pro se. This Court has held on many occasions that a mere request to substitute counsel is insufficient to assert the Faretta right. See, inter alia, State v. Branch, 288 N.C. 514, 220 S.E.2d 495 (1975), cert. denied, 433 U.S. 907 (1977), overruled on other grounds by State v. Adcock, 310 N.C. 1, 310 S.E.2d 587 (1984); State v. Cole, 293 N.C. 328, 237 S.E.2d 814 (1977); and State v. Hutchins, 303 N.C. 321, 279 S.E.2d 788 (1981). Similarly, this Court has held that a request to participate with court-appointed counsel in conducting the trial does not constitute a clear and unequivocal request to proceed pro se. State v. Thomas, 331 N.C. 671, 417 S.E.2d 473 (1992). And, like the Ninth Circuit, we have refused to find an assertion of the Faretta right, despite a defendant's request to proceed without counsel, where the defendant's contemporaneous statements made that request ambiguous. State v. McGuire, 297 N.C. 69, 254 S.E.2d 165, cert. denied, 444 U.S. 943 (1979); see also State v. Gerald, 304 N.C. 511, 284 S.E.2d 312 (1981).

In McGuire, defendant indicated at his arraignment hearing that he wanted the trial court to appoint him a new lawyer because he could not agree with his present one. Defendant added, " 'I am asking the court to let me defend myself in these cases.' " When the trial court refused to appoint new counsel, defendant repeated, " 'I am asking for another attorney.' " Thereafter, defendant reconciled with his attorney and specifically consented to his representation. On appeal, this Court held that, despite defendant's one request to represent himself, his statements and conduct viewed as a whole evinced only a desire for new counsel. Thus, defendant had "never 'clearly and unequivocally' asserted his desire to conduct a pro se defense." 297 N.C. at 82–83, 254 S.E.2d at 173–74.

We believe the case at bar is properly analogized to McGuire. As in McGuire, defendant at one point requested to proceed pro se. But when this request is viewed in the context of his other statements, it is apparent that defendant's primary desire was to ensure adequate representation by counsel, and that he never took a firm position on whether to proceed pro se.

When first addressing the trial judge, defendant expressed concern that his attorneys were not communicating with him adequately, and requested substitute counsel. When informed that he would not be permitted new counsel, and that his only options were to continue with present counsel or proceed pro se, defendant initially declined to represent himself. Soon thereafter, he changed his mind. Thus, defendant vacillated from the beginning.

That defendant still wished to be represented by counsel, despite his request to proceed pro se, is apparent from his statement the next day:

I understand the situation that I have chosen to represent myself. It is not that

14

> I would like to represent myself but if I could get a full new complete set of lawyers representing me and I would feel fair with that representation. I would like to continue on with my trial if I was able to receive things that I am entitled to have concerning my trial or evidence that is brought up against me and so on, state witnesses and so on.

> Thereafter, defendant specifically agreed to continue with present counsel on the trial judge's assurance that he would be provided with all the information he required. Tellingly, defendant never again requested to proceed pro se. Though he did reiterate his concern that he receive "the right representation from my lawyers," this statement merely confirms the fact that he wished to be represented by counsel.

> We therefore hold that defendant was not denied his right to represent himself at trial because he never asserted that right "clearly and unequivocally." We are reassured in so holding by the knowledge that, had defendant been permitted to represent himself based on his equivocal requests, he would now be arguing with some justification that he was denied the right to counsel. We refuse to place trial courts "in a position to be whipsawed by defendants clever enough to record an equivocal request to proceed without counsel in the expectation of a guaranteed error no matter which way the trial court rules." Meeks, 482 F.2d at 468.

> This assignment of error is overruled.

Williams, 334 N.C. at 451-57, 434 S.E.2d at 595-98.

Petitioner argues that the ambiguity cited by the North Carolina Supreme Court in denying this claim was the product of the trial court's repeated questioning of Petitioner and its clear reluctance to accept Petitioner's assertion that he wanted to proceed pro se. Pet. [DE-9], pp. 8-10. Petitioner also asserts that the trial court deemed Petitioner's assertion of his Faretta right unequivocal, and that such fact-finding was binding on the North Carolina Supreme Court and is entitled to deference in this court under § 2254(d). Id.

In general, "the assertion of the right to self-representation" must be "(1) clear and unequivocal; (2) knowing, intelligent, and voluntary; and (3) timely." United States v. Bush, 404 F.3d 263, 270-71 (4th Cir. 2005). Even where the defendant expresses an otherwise clear preference

for self-representation, the trial court should inquire into the surrounding circumstances before proceeding with an unrepresented defendant. Id. at 271, n. 4. In Bush, the defendant advised the court that he would prefer to represent himself because his attorney had refused to file certain motions on his behalf. Id. at 269. Ultimately, the trial court refused to allow the defendant to proceed pro se, finding that the defendant "did not clearly and unequivocally assert the right, and because [he] was not capable of making a knowing, intelligent, and voluntary waiver of his right to counsel." Id. at 271.

In this case, Petitioner expressed a preference to proceed pro se, and, consequently, the trial court engaged in extensive questioning of Petitioner to ascertain whether he was capable of making a knowing and voluntary waiver. During the course of this examination, Petitioner admitted that he would be willing to proceed with his appointed attorneys if they provided him with certain materials that he deemed essential to his defense. Indeed, as recognized by the trial court, Petitioner conceded that:

It is not that I would like to represent myself but if I could get a full new complete set of lawyers representing me and I would feel fair with that representation. I would like to continue on with my trial if I was able to receive things that I am entitled to have concerning my trial or evidence that is brought up against me and so on, state witnesses and so on.

Williams, 334 N.C. at 456, 434 S.E.2d at 597.

The court addressed and attempted to assuage this concern before "denying" Petitioner's assertion of his Faretta right. Petitioner points to no Supreme Court authority for his implicit argument that the trial court is not permitted to inquire, even strenuously, into all of the facts and circumstances surrounding a Petitioner's assertion of his Faretta right.

For these reasons, the North Carolina Supreme Court's resolution of this claim is neither

16

contrary to nor an unreasonable application of Supreme Court precedent, and is not based upon an unreasonable determination of the facts before that Court. Accordingly, Respondent is entitled to summary judgment on Claim I.

B.    Claim II

Petitioner claims that his right to be present at all stages of his criminal prosecution was violated when the court conducted an in-chambers conference with only the attorneys regarding Petitioner's request to proceed pro se. The North Carolina Supreme Court made the following findings regarding this claim:

> We now turn to defendant's argument that the trial court committed reversible error in holding some fifty unrecorded bench conferences with counsel. Of these, defendant seriously challenges only the one that occurred during the hearing to determine whether he would proceed pro se pursuant to Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). This five-minute, in-chambers conference took place immediately after defendant had first stated his desire to proceed pro se. The subject of the conference appears to have been this motion, for when the judge returned to the courtroom he said: "[T]he Court has taken very seriously the statements that you made a few moments ago. I have been thinking about it and talked briefly with the attorneys in my chambers." The judge did not immediately rule on the motion but rather recessed the court until the next day, at which time he questioned defendant at great length before denying the motion.

> Under Buchanan, an unrecorded bench conference between the trial judge and counsel will not be considered violative of the defendant's right to presence unless "the subject matter of the conference implicates the defendant's confrontation rights, or is such that the defendant's presence would have a reasonably substantial relation to his opportunity to defend." 330 N.C. at 223–24, 410 S.E.2d at 845. Thus, the defendant must show the "usefulness" of his presence in order to prove error. If he can sustain this burden, the State may still show that the error was harmless beyond a reasonable doubt. Id. Defendant has attempted to sustain his burden of proof with respect to only one of the challenged conferences. His allegation of error regarding the others must necessarily fail.

> As to the conference which occurred during his Faretta motion, it is at least arguable that his presence could have been useful given his peculiar knowledge of the manner in which defense counsel had handled his case. Assuming arguendo that it was error

17

to exclude defendant from this conference, we believe the error was harmless beyond a reasonable doubt. The trial judge did not decide on defendant's motion at the in-chambers conference but rather explored the issue fully with defendant in open court before ruling. Thus, defendant had ample opportunity to convey whatever knowledge he had to the judge.

Williams, 339 N.C. at 31-32, 452 S.E.2d at 263-64.

Any exclusion of Petitioner which arguably violated his right to be present during his criminal proceedings is subject to harmless error review. See Rogers v. United States, 422 U.S. 35, 40 (1975). Petitioner maintains that his presence at this unrecorded, in-chambers conference was "necessary to assure fairness" at trial because, had he been present, "a reasonable probability exists that . . . defendant's Faretta motion would have been allowed, and that the error had a 'substantial and injurious effect' on the outcome of the proceeding." Pet. [DE-9], pp. 10-11. However, the trial court thoroughly explored the relevant issues in open court with Petitioner before declining to allow him to proceed pro se. Given the court's considerable effort and time addressing this issue with Petitioner in court, any error in excluding him from the in-chambers conference was harmless.

For these reasons, the North Carolina Supreme Court's decision denying this claim is neither contrary to nor an unreasonable application of Supreme Court precedent, and is not based upon an unreasonable determination of the facts in light of the record before that Court. Accordingly, Respondent is entitled to summary judgment on Claim II.

C.    Claim III

Petitioner claims that his right to be tried by a fair and impartial jury was violated when the trial court failed to conduct a sufficient inquiry into a note provided by one of the jurors, Teresa Smith, during deliberations. He also claims that the trial court improperly instructed the jury when it declined to excuse Ms. Smith.

18

When Ms. Smith was called during voir dire, one of Petitioner's attorneys, Jerry Braswell, stated "I know Mrs. Smith . . . she is a client of mine." Resp't. Ex. A1, p. 337. During her voir dire testimony, Ms. Smith clarified that she had recently consulted with Mr. Braswell in relation to a "domestic problem"– specifically a separation. Id. at 338-339. She also thought her employer, a locksmith, was doing some work for Mr. Braswell and Petitioner's other attorney, Louis Jordan. Id. at 346. Ms. Smith was then specifically asked whether these were the only prior contacts she had with Mr. Braswell or Mr. Jordan and she responded in the affirmative. Id. Ultimately, Ms. Smith testified that these prior contacts with Mr. Braswell and Mr. Jordan would not sway her impartiality. Id. at 340, 346-347; Resp't. Ex. A6, p. 366. Both parties accepted Ms. Smith as a juror, and she was instructed to "stay out of . . . [Mr. Braswell's] office for a few weeks." Resp't. Ex. A6, pp. 356, 369.

During jury deliberations on the guilt phase of Petitioner's trial, Ms. Smith sent the following note to the trial judge: "I, Teresa Smith, ask to be dismissed on the fact that my ability to make a fair and impartial decision on the guilt or innocence of Marvin E. Williams may be influenced by personal involvement with one of the defense lawyers . . ." Resp't. Ex. A5, p. 1274. The trial judge stated "I think this is the lady that mentioned [Mr. Braswell] had done some work for her in the past" and Mr. Braswell responded that he thought that was correct. Id. at 1275. Both the prosecutor and Mr. Jordan argued that Ms. Smith's request should be denied due to the length of time the jury had already deliberated. Id. A bench conference was then conducted, during which the trial judge asked Mr. Braswell to make a statement for the record. Mr. Braswell replied:

Your Honor, to clarify her comment I am assuming when she says personal involvement, what she is actually referring to is the matter she disclosed on voir dire. That is she had consulted with me regarding a domestic problem that she had experienced and for the record, she has never retained me as her attorney but simply

19

consulted with me about a week or so prior to the jury selection process.[4]

Id. at 1276.

The prosecutor added, "[n]ow she is saying something different than what she said on voir dire."

Id.  After the bench conference, the trial court recessed to consult with counsel for the Administrative Office of the Courts. Id. at 1277. When court reconvened, the trial judge determined that he would "force the juror to continue with the case and . . . give [all the jurors] some further instructions on the need to be fair and impartial . . ." Id. Specifically, the trial judge informed Ms. Smith and the jury:

> I have read your note and I have talked with the attorneys about this. I have placed the contents of your note into the Court record and I have considered it and feel that it would be impractical to discharge you from the case at this point. I could not substitute an alternate juror in your stead at this point in time. It is rather late in the process for me to be discharging jurors. *If I discharge you as a juror then five weeks of work would go down the drain.* I would have to declare a mistrial in this case and I am not prepared to do that. And so I am going to require you to stay on the case and to deliberate with the other jurors with a view towards reaching a verdict in this case if one can be reached without doing violence to your individual judgment. I will say to you, as well as to the other jurors, that you have a duty to consult with one another, to debate your views and your contentions and your disagreements and attempt, as best you can, to reach a verdict in this case without doing violence to your individual judgment. You should not base your verdict in this case on anything but the evidence and the law. You have heard the evidence, as I have, for the past few days. You have heard the Court's instructions on the law and if you are not clear on those instructions, I will be delighted to re-instruct you on any particular instruction that you may not be clear on but you have a duty to decide this case purely on the evidence and the law of this State and to set aside any knowledge that you may have of any persons associated with the trial or any other information that may tend to influence your decision in the case. And so to sum it all up, I have considered your request but your request regretfully will be denied.

Id. at pp. 1277-78 (emphasis added).

---

[4] As will be discussed more fully when addressing Petitioner's ineffective assistance of counsel claims, Mr. Braswell was intentionally misleading the court when he made this statement.

### 1. Procedural default

Petitioner concedes that he did not raise the federal issue underlying this claim on direct appeal. Pet. [DE-9], pp. 12-13. Therefore, Respondent contends that this claim is procedurally defaulted because it would be procedurally barred if presented in a subsequent state court MAR, as Petitioner could have raised the claim in a previous MAR or appeal but failed to do so. Resp't. Mot. for Summ. J. [DE-10], pp. 20-21. Petitioner argues that his claim would not be procedurally barred in state court because to do so would be a "miscarriage of justice." Pet'r. Resp. [DE-14], p. 10.

"The procedural default doctrine bars a claim when the habeas petitioner 'fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" Mickens v. Taylor, 240 F.3d 348, 356 (4th Cir. 2001). "Where a state procedural rule is both adequate and independent, it will bar consideration of the merits of claims on habeas review unless the petitioner demonstrates cause for the default and prejudice resulting therefrom or that a failure to consider the claims will result in a fundamental miscarriage of justice." McNeill v. Polk, 476 F.3d 206, 211 (4th Cir. 2007). The procedural rule Respondent relies upon in asserting that Petitioner's claim would be procedurally barred if presented in a state court MAR, N.C. Gen. Stat. § 15A-1419(a), is an adequate and independent state procedural rule for purposes of applying procedural default in federal habeas proceedings. See Brown v. Lee, 319 F.3d 162, 170 (4th Cir. 2003); see also Lawrence v. Branker, 517 F.3d 700, 714-15 (4th Cir. 2008) ("We have consistently held that § 15A-1419(a)(3) is an independent and adequate state ground for purposes of procedural default."). North Carolina's procedural bar does not apply to a MAR if the defendant can establish "[g]ood cause for excusing the ground for denial . . . [and] actual prejudice resulting from the defendant's claim," or

21

"[t]hat failure to consider the defendant's claim will result in a fundamental miscarriage of justice."

N.C. Gen. Stat. § 15A-1419(b)(1) and (2). It is the latter provision, concerning a purported

"fundamental miscarriage of justice," upon which Petitioner relies in arguing that his hypothetical

MAR would not be barred in state court. Pet'r. Resp. [DE-14], p. 10.

Petitioner describes the "miscarriage of justice" as follows:

The State's case was far from overwhelming as it depended entirely on the credibility
of a genuinely unsavory witness who admitted many motives to fabricate his
testimony. In such a case the inclusion or retention of a juror who has in writing
indicated her inability to remain impartial renders the result of the trial inherently
unreliable and in such a case the denial of the petitioner's right to a fully impartial
jury is manifestly unjust.

Id.

Petitioner's assertion of a "miscarriage of justice" sufficient to excuse the procedural bar of

his claim under state law is unavailing. The relevant statute states that a "fundamental miscarriage

of justice only results if . . . [t]he defendant establishes that more likely than not, but for the error,

no reasonable fact finder would have found the defendant guilty of the underlying offense." N.C.

Gen. Stat. § 15A-1419(e). Petitioner's argument does not bear on the quality of the evidence relied

upon by the jury and, therefore, does not establish that "no reasonable fact finder would have found

the defendant guilty of the underlying offense." Thus, Petitioner's failure to raise this claim on direct

appeal or in a previous MAR would not be excused due to a "fundamental miscarriage of justice"

as that term is defined in North Carolina law. As such, the claim is procedurally defaulted from

review in federal habeas unless Petitioner can show cause for the default and prejudice from the

resulting error, or that failure to consider his claim will result in a fundamental miscarriage of justice.

22

For reasons discussed below, Petitioner's argument that counsel provided ineffective assistance of counsel does not show cause for the default and prejudice from the resulting error. Likewise, Petitioner's assertion that a "fundamental miscarriage of justice" will result if his claim is procedurally defaulted is unavailing because he has not submitted "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" Schlup v. Delo, 513 U.S. 298, 316 (1995) ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of a justice that would allow a habeas court to reach the merits of a barred claim.").

In the alternative, even if this claim were not procedurally barred it would fail on its merits. The court will address the merits of each prong of this claim in turn.

2. Ms. Smith's request to be excused

Petitioner contends that the trial court should have conducted a more extensive inquiry when Ms. Smith requested to be excused as a juror. In order to obtain a new trial based on a juror's failure to disclose information during voir dire, a petitioner generally "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." See McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). The social contacts between Mr. Braswell and Ms. Smith do not satisfy this standard. Moreover, the Fourth Circuit requires "a showing of actual bias in cases involving alleged juror impartiality after a verdict has been reached." United States v. Malloy, 758 F.2d 979, 982 n.6 (4th Cir. 1985). On this record, and also in light of the deference given to the state court's findings of fact, the court is unable

23

to conclude that Ms. Smith held an actual bias that would have rendered her service prejudicial. See, Bey v. United States, No. RWT-11-3238, 2013 WL 715148, at * 4 (D. Md. Feb. 25, 2013), appeal dismissed, 2013 WL 2996436 (4th Cir. June 18, 2013). Nor is this one of the "extreme situations" in which juror bias may be implied. United States v. Brewer, _ F. Appx. _, 2013 WL 3722358 (4th Cir. 2013) (unpublished opinion) (citing Person v. Miller, 854 F.2d 656, 664 (4th Cir. 1998)).

### 3. The trial court's instruction to the jury

Petitioner contends that the trial court erred when it informed the jury that "five weeks of work would go down the drain" if Ms. Smith was discharged. Citing State v. Easterling, 300 N.C. 594, 268 S.E. 2d 800 (1980), Petitioner argues that, in the state of North Carolina, "there exists a prohibition against advising juries of wasted judicial resources arising from mistrials in criminal cases." Pet. [DE-9], p. 25. In Easterling, the North Carolina Supreme Court concluded that, pursuant to N.C. Gen. Stat. § 15A-1235, "a North Carolina jury may no longer be advised of the potential expense and inconvenience of retrying the case should the jury fail to agree." Easterling, 300 N.C. at 608, 268 S.E. 2d at 809. However, the Easterling court also held that "[n]ot every violation of the procedures embodied in Chapter 15A amounts to prejudicial error." Id. at 608. Specifically, the Easterling court observed:

Considering as we must the circumstances under which the erroneous instruction was given and its probable impact upon the jury, see State v. Cousin, 292 N.C. 461, 233 S.E.2d 554 (1977), we do not think defendant in the instant case has met his burden of showing prejudice. The record provides not the slightest indication that the jury was in fact deadlocked in its deliberations, or in any other way open to pressure by the trial judge to "force" a verdict, at the time the charge was given. Furthermore, the charge itself makes clear that the trial court did not intend that any juror surrender his conscientious convictions or judgment and contains no such element of coercion as to warrant a new trial. State v. Williams, 288 N.C. 680, 220 S.E.2d 558 (1975). Thus, although the charge itself was in part impermissible under G.S. 15A-1235, we do not believe its use prejudiced defendant in the case before us.

24

Id. at 609, 268 S.E. 2d at 809.

Here, as in Easterling, Petitioner was not prejudiced by the trial court's charge. The trial court's statement to the jury when it refused to excuse Ms. Smith "contains no such element of coercion as to warrant a new trial." Id. Therefore, Petitioner was not denied due process. Cf. Waddington v. Sarausad, 555 U.S. 179, 191 (2009) (noting that the pertinent question regarding a jury instruction is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process") (quotation omitted)).

Moreover, this claim ultimately rests on a state court interpretation of a North Carolina statute. However, "'federal habeas corpus relief does not lie for errors of state law.' " Estelle v. McGuire, 502 U.S. 62, 67 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Id. at pp. 67–68. See also Grundler v. North Carolina, 283 F.2d 798, 802 (4th Cir. 1960) (noting that "instructions to the jury in state trials are matters of state law and procedure not involving federal constitutional issues").

In summary, Claim III is procedurally barred. In the alternative, the trial court's adjudication of these issues was not contrary to or an unreasonable application of Supreme Court precedent, and is not based upon an unreasonable determination of the facts before that Court. Accordingly, Respondent is entitled to summary judgment on Claim III.

D.     Claim IV

Petitioner claims that trial counsel rendered ineffective assistance. The Fourth Circuit described the standards governing the court's analysis of ineffective assistance claims as follows:

To demonstrate ineffective assistance of counsel, Petitioner must show "that

25

counsel's performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521 (2003). Regarding the first prong, a "deficient" performance is one that falls "below an objective standard of reasonableness." Id. at 511. Petitioner must show "that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment." Harrington, 131 S.Ct. at 787 (internal quotations marks omitted). See also Strickland v. Washington, 466 U.S. 668, 687 (1984) ("First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.").

[A court's] deferential assessment of counsel's performance must "include [] a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time . . . ." Wiggins, 539 U.S. at 523 (internal quotation marks omitted). Further, we must resist the temptation to "second-guess counsel's assistance after conviction or adverse sentence" and make "every effort . . . to eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689. Indeed, we must review with "scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve." Harrington, 131 S.Ct. at 788 (internal quotation marks omitted).

Decastro v. Branker, 642 F.3d 442, 450 (4th Cir. 2011).

As to the second Strickland prong, prejudice, Petitioner must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. Thus, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 688. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. This showing "requires a substantial, not just conceivable, likelihood of a different result." Cullen v. Pinholster, _ U.S. _, 131 S.Ct. 1388, 1403 (2011) (internal quotations omitted). "The totality of the evidence before the judge or jury must be considered in making this determination." Williams v. Ozmint, 494 F.3d 478, 484 (4th Cir. 2007) (internal quotation marks omitted).

Furthermore, the Supreme Court has discussed the interplay of the Strickland ineffectiveness

26

standard and the deferential review standard of AEDPA as follows:.

> The pivotal question is whether the state court's application of the Strickland
> standard was unreasonable. This is different from asking whether defense counsel's
> performance fell below Strickland's standard. Were that the inquiry, the analysis
> would be no different than if, for example, this Court were adjudicating a Strickland
> claim on direct review of a criminal conviction in a United States district court.
> Under AEDPA, though, it is a necessary premise that the two questions are different.
> For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different
> from an *incorrect* application of federal law." Williams, *supra*, at 410. A state court
> must be granted deference and latitude that are not in operation when the case
> involves review under the Strickland standard itself.
>
> . . .
>
> "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559
> U.S. __, __, 130 S.Ct. 1473, 1485 (2010). An ineffective-assistance claim can
> function as a way to escape rules of waiver and forfeiture and raise issues not
> presented at trial, and so the Strickland standard must be applied with scrupulous
> care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary
> process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690.
> Even under *de novo* review, the standard for judging counsel's representation is a
> most deferential one. Unlike a later reviewing court, the attorney observed the
> relevant proceedings, knew of materials outside the record, and interacted with the
> client, with opposing counsel, and with the judge. It is "all too tempting" to "second-
> guess counsel's assistance after conviction or adverse sentence." Id. at 689; see also
> Bell v. Cone, 535 U.S. 685, 702 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372
> (1993). The question is whether an attorney's representation amounted to
> incompetence under "prevailing professional norms," not whether it deviated from
> best practices or most common custom. Strickland, 466 U.S., at 690.
>
> Establishing that a state court's application of Strickland was unreasonable under §
> 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d)
> are both "highly deferential," id., at 689; Lindh v. Murphy, 521 U.S. 320, 333 n.7
> (1997), and when the two apply in tandem, review is "doubly" so, Knowles[ v.
> Mirzayance, 556 U.S. __, __, 129 S.Ct. 1411,1420 (2009)]. The Strickland standard
> is a general one, so the range of reasonable applications is substantial. 556 U.S., at
> __, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of
> equating unreasonableness under Strickland with unreasonableness under § 2254(d).
> When § 2254(d) applies, the question is not whether counsel's actions were
> reasonable. The question is whether there is any reasonable argument that counsel
> satisfied Strickland's deferential standard.

Harrington, __ U.S. at __, 131 S.Ct. at 785, 788 (emphasis in original).

27

The Fourth Circuit has recently reiterated the difficulty of meeting this standard in <u>Moore v.</u>

<u>Hardee</u>, stating:

> Determining whether the state court unreasonably applied <u>Strickland</u> is different from asking whether defense counsel's performance fell below <u>Strickland's</u> standard, in part because an unreasonable application of federal law is different from an incorrect application of federal law . . . That a petitioner's <u>Strickland</u> claim may have had merit does not alone justify awarding habeas; even a strong case for relief does not mean the state court's contrary conclusion was unreasonable under the AEDPA. Under this high bar, a writ may issue only where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with the Court's precedents.

<u>Moore v. Hardee</u>, 723 F. 3d 488, 496 (4th Cir. 2013) (citations and quotations omitted).

Petitioner's ineffective assistance of counsel claims shall now be analyzed in light of these standards.

           1.      Counsel's failure to move for a mistrial or hearing

Petitioner contends that counsel was ineffective when he failed to move for a mistrial or further hearing when Ms. Smith requested to be discharged. Specifically, Petitioner asserts that his "constitutional right to effective, conflict-free counsel was violated because his trial attorney had an interest in avoiding professional sanctions that conflicted with his client's interest in obtaining a mistrial and being tried by an impartial jury." Pet'r. Mem. [DE-57], p. 4. Petitioner raised this claim in his July 3, 1999 MAR and the MAR court summarily denied it. Res. Ex. O, pp. 12-13.

Mr. Braswell executed an affidavit on October 14, 1999, well after Petitioner's direct appeal and first MAR. Pet'r. Ex. B [DE-57-2], pp. 9-12. In this statement, Ms. Braswell concedes that his prior personal contact with Ms. Smith, while not extensive, was greater than he had acknowledged during Petitioner's trial. Contrary to the statements he made at trial, Mr. Braswell indicated:

> 2. I had met Ms. Teresa Smith socially, before she ever came to my office for any legal advice, and before the trial. I believe that I might have dated a friend of Ms. Smith's and that this may have involved being out socially with that friend and Ms. Smith and perhaps a date of Ms. Smith's. I believe that I may have also seen and

28

socialized with Ms. Smith at one or more parties. I was single at the time and was actively dating. I believe that I may have socialized with Ms. Smith on more than one occasion. In any event, I recall that my social contact with her had been such that she was comfortable enough to drop by my office for some advice about a domestic matter, which I believe was a child support or custody hearing. I do not recall whether she made an appointment but I believe she just dropped by.

3. I did not open any file with regard to the domestic matter and did not undertake any representation of her following the trial of the defendant, and I do not believe that I have spoken with her since the trial.

4. At the trial when Ms. Smith came into the court room I recognized her, and believed she recognized me. When I indicated to the Court that I knew Ms. Smith and that she was a client of mine, I expected that this might induce the prosecutor to use up a peremptory challenge on Ms. Smith. While the prosecutor was questioning Ms. Smith on voir dire, I did not feel that Ms. Smith would disclose to the prosecutor our social relationship unless directly asked. After the prosecutor passed Ms. Smith, co-counsel Louis Jordan examined Ms. Smith on voir dire. I recall that I was lead counsel, and that I conducted most of the voir dire examination of the jurors, and believe that it was likely that Mr. Jordan's examination of Ms. Smith was less likely to result in any disclosure of social contact that I had had with Ms. Smith prior to the trial. In deciding to pass Ms. Smith as a juror, I believed that my prior social contact with her would be advantageous in that Ms. Smith might be somewhat more receptive to my arguments in favor of the defendant.

5. When Ms. Smith sent out her note during deliberations on guilt/innocence, I continued to believe that she would be a favorable juror, because of this social contact, and because I had offered her some professional advice, and I did not want her to be removed from the jury. I concede in hindsight that from the text of Ms. Smith's note one might infer that she would not continue to be favorable to the defendant. I further state that because I believed then that she would continue to be favorable, I felt it best to discourage disclosure of the prior social contact, in that this might result in her removal from the jury.

Id.

The court is deeply disturbed by Mr. Braswell's behavior. Mr. Braswell clearly states that

he was cognizant of his prior social contacts with Ms. Smith when "she came into the courtroom."

Id. However, when the trial court specifically asked Mr. Braswell to comment on Ms. Smith's note,

he replied "I am assuming when she says personal involvement, what she is actually referring to .

29

. . is she had consulted with me regarding a domestic problem." Resp't. Ex. A5, p. 1276. Thus, he essentially admits in his affidavit to being less than candid with the trial court. Rule 3.3 of the North Carolina Rules of Professional Conduct prohibits an attorney from making "a false statement of material fact or law to a tribunal." N.C. Rule of Prof'l. Conduct 3.3(a)(1). Here, Mr. Braswell was less than forthcoming when asked by the trial judge to describe his prior interactions with Ms. Smith. Res. Ex. A5, p. 1276. Likewise, Mr. Braswell concedes in his affidavit that he realized Ms. Smith was not accurately describing their prior interactions to the court, yet he took no remedial measures to correct Ms. Smith's voir dire testimony. Pet. Ex. B [DE-57-2], p. 9-11. On the contrary, he determined that it would be tactically "advantageous" for this information not to come to light. Id.

Ultimately, however, Sixth Amendment constitutional analysis is independent of attorney rules of professional conduct. Moss v. United States, 323 F.3d 445, 476 (6th Cir. 2003) (even where defense counsel "strain[ed] to their very limits the boundaries of professional conduct" court was unable to conclude that proceedings were rendered fundamentally unfair); see also Nix v. Whiteside, 475 U.S. 157, 165 (1986) (breach of ethical standard not tantamount to denial of defendant's Sixth Amendment rights). Had Ms. Smith's voir dire testimony been corrected, her relatively minimal prior social contacts with Mr. Braswell would not have been the valid basis of a challenge for cause. Therefore it was reasonable for the state court to hold that Mr. Braswell was not ineffective when he chose not to move for a mistrial or request a hearing. Mr. Braswell's lack of candor does not render his representation ineffective, nor does it render the state court's adjudication of this claim an unreasonable application of federal law. Cf. Moore, 723 F. 3d at 496 (noting that "doubly deferential review requires the court to determine not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied Strickland 's deferential standard.")

(quotation omitted)).

Petitioner also argues that Mr. Braswell's lack of candor created a conflict of interest because "his interest in avoiding the prospect of professional sanctions by keeping his personal relationship with Juror Smith secret conflicted with his client's interests in obtaining a mistrial and being tried by an impartial jury." Pet'r. Mem. [DE-57], p. 11. In cases in which there is an actual conflict of interest, "[p]rejudice is presumed ... if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" Strickland, 466 U.S. at 692 (quoting Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)). To establish an actual conflict of interest, Petitioner "must show that his interests diverged with respect to a material factual or legal issue or to a course of action." United States v. Nicholson, 475 F.3d 241, 249 (4th Cir. 2007) (quotation and alteration omitted). A conflict may not always be "as apparent as when [an attorney] formally represents two parties who have hostile interests." United States v. Tatum, 943 F.2d 370, 376 (4th Cir. 1990). An attorney "may harbor substantial personal interests which conflict with the clear objective of his representation of the client." Id.

Here, the possibility that Mr. Braswell potentially faced disciplinary action for his lack of candor towards the tribunal could be construed as an actual conflict of interest. United States v. Williams, 343 F. App'x. 912, 914 (4th Cir. 2009) (unpublished opinion) ("If an attorney faces disciplinary action or criminal charges based on his actions on behalf of a client, the attorney cannot pursue the client's interests free from concern for his own") (citing United States v. Merlino, 349 F.3d 144, 152 n. 3 (3d Cir. 2003)). Conversely, however, Mr. Braswell only faced the possibility of disciplinary action, and "the possibility of conflict is insufficient to impugn a criminal conviction." Cuyler, 446 U.S. at 350. Thus it is possible that Mr. Braswell's behavior "strain[ed]

31

to their very limits the boundaries of professional conduct", Moss, 323 F.3d at 476, but did not create a conflict of interest. Nonetheless, on this record, the court will assume, without deciding, that a conflict existed.

However, Petitioner has not established that Mr. Braswell's performance was adversely affected. In analyzing this issue, Petitioner must satisfy the three-factor test described in Mickens:

> First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision. [To demonstrate objective reasonableness,] the petitioner must show that the alternative strategy or tactic was "clearly suggested by the circumstances." Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

Mickens, 240 F.3d at 361 (4th Cir.2001) (en banc) (citation omitted) (quoting Tatum, 943 F.2d at 376); see also, United States v. Nicholson, 611 F.3d 191, 197 (4th Cir. 2010).

Here, Petitioner has identified a plausible strategy or tactic that Mr. Braswell might have pursued: requesting a mistrial or a hearing to further explore Ms. Smith's impartiality. Pet. [DE-9], pp. 18-20. However, this strategy was not objectively reasonable under the facts of the case known to Mr. Braswell at the time of his tactical decision. On the contrary, the record clearly indicates that Mr. Braswell chose to withhold information from the tribunal because he believed it would be "advantageous" for Petitioner because Ms. Smith "would be a favorable juror." Pet'r. Ex. [DE-57-2], p. 10. Only with the benefit of hindsight did Mr. Braswell believe otherwise, id., and this court must make every effort "to eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689. Similarly, Petitioner has not demonstrated that Mr. Braswell's unethical behavior was linked to an actual conflict. Again, Mr. Braswell's motivation was clearly to prevent an ostensibly favorable juror from being discharged.

32

In summary, Mr. Braswell's performance, while unethical, was not ineffective. Therefore, the state court's decision denying this claim is neither contrary to or an unreasonable application of Supreme Court precedent, and is not based upon an unreasonable determination of the facts in light of the record before the Court. Accordingly, Respondent is entitled to summary judgment on this prong of Claim IV. However, the court also finds that this determination is debatable and will therefore grant a certificate of appealability regarding this claim.

2. Counsel's failure to object to inadmissible testimony and argument

Petitioner contends that "[d]uring his direct examination [of Dr. Thomas Clark, the medical examiner who performed the autopsy on Mr. Price], the prosecutor began asking, repeatedly, hypothetical questions which . . . assumed facts not in evidence." Pet. [DE-9], pg. 20. Specifically, Petitioner argues that during the direct examination of Dr. Clark, "the prosecutor's continuously assumed or asked the medical examiner to assume that the victim was either unconscious, or prone, or both during the time in which he was being struck by the perpetrator." Id. Furthermore, Petitioner alleges that the prosecutor mischaracterized Dr. Clark's testimony during his closing arguments both at the guilt and sentencing phase. Id. at pp. 21-22. Petitioner argues that counsel was ineffective because he failed to object to the prosecutor's questioning of Dr. Clark and to the argument based upon the resulting testimony. Id. at pp. 20-22. In its May 22, 1997 order, the MAR court determined that "[t]he hypothetical questions asked of the pathologist by the prosecutor and the answers given thereto were neither impermissible nor prejudicial." Resp't. Ex. O, p. 12.

Dr. Clark testified that ultimately he was unsure whether Mr. Price was prone or unconscious while he was attacked by Petitioner. Resp't. Ex. A5, pp. 1017, 1018, 1022, 1027. However, Dr. Clark clearly testified that is was possible that Mr. Price was unconscious or prone during this attack.

33

For example, Dr. Clark testified:

> [The decedent] could have been sitting or lying on the ground . . . It
> is possible that these injuries affected the decedent's consciousness
> . . . [B]low number 5 . . . [m]ay have contributed to unconsciousness
> . . . [I]t is possible that consciousness was lost following the first
> [blow] and that . . . others were inflicted subsequent to that.

Id. at pp. 1017, 1018, 1024, 1027.

Based on this testimony, any hypothetical premised on the fact that Mr. Price was prone or unconscious during the attack was based on facts in evidence. The prosecutor's questions to Dr. Clark were not impermissible or prejudicial, and counsel was not ineffective in choosing not to object to them. Cf. State v. Taylor, 290 N.C. 220, 230, 226 S.E.2d 23, 28 (N.C. 1976) ("[I]t is not necessary to include in [a] hypothetical question all the evidence bearing upon the facts to be proved."); Dean v. Carolina Coach Co., Inc., 287 N.C. 515, 518, 215 S.E.2d 89, 92 (N.C. 1975) ("[T]here is substantial authority to the effect that the interrogator may form his hypothetical question on any theory which can be deduced from the evidence and select as a predicate therefor such facts as the evidence reasonably tends to prove.").

Likewise counsel was not ineffective when he choose not to object to any jury argument asserting Mr. Price was unconscious and or prone. In its rejection of this claim, the North Carolina Supreme Court noted:

Defendant next takes issue with the prosecutor's argument that the victim received at least one of seven blows while on the ground. According to defendant, there was no evidence to this effect. The following is testimony of the medical examiner:

> Q. Doctor, if [the victim] was rendered unconscious ... at any time
> during the seven blows, do you have an opinion ... whether or not he
> was hit while on the ground?

> A. If he became unconscious during the course of these 7 blows, prior

34

to the last blow, yes, he would have fallen down and one of them would have necessarily been inflicted while he was down.

Q. Could it have been more than one blow that inflicted to his skull while in a prone position ...?

A. Yes, since there are three groups of injuries which have the potential to cause loss of consciousness, it is possible that consciousness was lost following the first and that the two others were inflicted subsequent to that.

That one of the blows was inflicted while the victim was on the ground was a reasonable inference from this testimony.

Williams, 339 N.C. at 34-35, 452 S.E.2d at 265.

This court agrees that the prosecutor made reasonable inferences in his argument to the jury, and counsel was not ineffective in choosing not to object to this argument. State v. Morgan, 299 N.C. 191, 207, 261 S.E.2d 827, 837 (N.C. 1980) (noting that "counsel have wide latitude in making their arguments to the jury").

For these reasons, the state court denial of this claim was neither contrary to or an unreasonable application of Supreme Court precedent, and was not based upon an unreasonable determination of the facts in light of the record before that Court. Accordingly, Respondent is entitled to summary judgment on this prong of Claim IV.

3. Counsel's failure to object to the trial court improperly advising the jury

Finally, Petitioner asserts that trial counsel should have objected when the trial court informed the court that if Ms. Smith was discharged "five weeks of work would go down the drain." Pet. [DE-9], p. 25.

This claim was considered by the North Carolina Supreme Court, which held:

Defendant next contends the trial court, upon denying Ms. Smith's request for

35

excusal, committed prejudicial error when it advised the jury that "five weeks of work would go down the drain" if a mistrial were declared . . . Considering the trial court's full instruction, which repeatedly advised the jurors that, while deliberating, they were not to agree to a verdict that would violate any juror's individual judgment, we are confident the trial court's isolated comment had no probable impact on the jury's verdict and did not deprive defendant of due process.

Williams, 339 N.C. at 40-41, 452 S.E. 2d 245, 269.

Furthermore, this claim was also addressed in the May 22, 1997 MAR. The MAR court summarily determined that the claim was without merit. Resp't Ex. O, p. 14.

As described above, the trial court's statement to the jury did not deny Petitioner due process. Therefore, counsel's decision to not object to this instruction was not ineffective representation. Sharpe v. Bell, 593 F.3d 372, 382 (4th Cir. 2010) ( "Counsel is not required to engage in the filing of futile motions."). Accordingly, the state court's denial of this claim was neither contrary to or an unreasonable application of Supreme Court precedent, and was not based upon an unreasonable determination of the facts in light of the record before the Court. Accordingly, Respondent is entitled to summary judgment on this prong of Claim IV.

E. Claim V

Petitioner argues that the trial court gave an improper jury instruction on reasonable doubt. Pet. [DE-9], pp. 26-28. Specifically, after Ms. Smith's request to be excused from the jury was denied, another juror requested that the trial judge repeat the instruction on reasonable doubt. In response to this request, the trial judge informed the jury:

Ladies and gentlemen, I will again define for you the concept of reasonable doubt as it has been defined in a case of our Supreme Court entitled State v. Hammonds. Ladies and gentlemen, I instruct you that a reasonable doubt is not a vain, imaginary or fanciful doubt but it is a sane, rational doubt. When it is said that the jury must be satisfied of the defendant's guilt beyond a reasonable doubt, it is meant that they must be fully satisfied or entirely convinced or to put it another way, satisfied to a moral

36

certainty of the truth of the charge. If, after considering, comparing and weighing all the evidence, the minds of the jurors are left in such condition that they cannot say they have an abiding faith to a moral certainty in the defendant's guilt, then they have a reasonable doubt, otherwise not. A reasonable doubt as that term is employed in the administration of criminal law, is a[n] honest substantial misgiving generated by the insufficiency of the proof, an insufficiency which fails to convince your judgment and conscience and satisfy your reason as to the guilt of the accused. It is not a doubt suggested by the ingenuity of counsel or by your own ingenuity not legitimately warranted by the testimony or one born of merciful inclination or disposition to permit the defendant to escape the penalty of the law or one prompted by sympathy for him or those connected with him. That is the best definition, ladies and gentlemen, that I have run across in my work and I have saved it and use it occasionally and that is the law of this State as it pertains to reasonable doubt.

Resp't. Ex. A5, p. 1280-81.

Petitioner argues that "[a] reading of the full instruction given here leads to the conclusion that there was a reasonable likelihood that the jury was misled or confused by the instruction, and therefore applied it in a way that violated the Constitution by succumbing to the suggestion of either an improperly high degree of doubt for acquittal or an improperly low degree of certainty for conviction." Pet. [DE-9], p. 28.

This claim was considered on direct appeal by the North Carolina Supreme Court which found error and ordered a new trial. Williams, 334 N.C. at 447, 434 S.E.2d at 591-92 . The State petitioned for certiorari to the United States Supreme Court, which was granted and the case was ultimately remanded for reconsideration in light of Victor v. Nebraska, 511 U.S. 1(1994). Williams, 511 U.S. 1001 (1994). In Victor, the United States Supreme Court held:

The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course . . . Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof . . . Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury.

37

<u>Victor</u>, 511 U.S. at 5 (quotations, citations and alteration in original omitted).

On remand the North Carolina Supreme Court found no error in the instruction. <u>Williams</u>,

339 N.C. at 13, 452 S.E. 2d at 253. Specifically, that court stated:

> On the Court's first consideration of defendant's appeal, we granted a new trial, concluding the trial court's instruction on reasonable doubt denied defendant due process. <u>State v. Williams</u>, 334 N.C. 440, 434 S.E.2d 588 (1993) (<u>Williams I</u>). This decision was based entirely on <u>State v. Bryant</u>, 334 N.C. 333, 432 S.E.2d 291 (1993) (<u>Bryant I</u>). In <u>Bryant I</u>, the Court held that, under <u>Cage v. Louisiana</u>, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), and <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), an essentially identical instruction violated the Due Process Clause of the Fourteenth Amendment.
>
> After our decision in <u>Bryant I</u>, the United States Supreme Court decided <u>Victor v. Nebraska</u>, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), in which it clarified its holdings in <u>Cage</u> and <u>Sullivan</u> and held that certain reasonable doubt instructions similar to those we considered in <u>Bryant I</u> and <u>Williams I</u> did not violate the Due Process Clause. Thereafter, the United States Supreme Court vacated this Court's decisions in <u>Bryant I</u> and <u>Williams I</u> and remanded these cases to us for consideration in light of Victor. <u>North Carolina v. Bryant</u>, 511U.S. 1001, 114 S.Ct. 1365, 128 L.Ed.2d 42 (1994); <u>North Carolina v. Williams</u>, 511 U.S. 1001, 114 S.Ct. 1365, 128 L.Ed.2d 42 (1994).
>
> On remand, we concluded in <u>State v. Bryant</u>, 337 N.C. 298, 446 S.E.2d 71 (1994) (<u>Bryant II</u>), that, in light of Victor, there was no reversible error in the reasonable doubt instruction. Since the instructions here are practically identical to those in <u>Bryant I and II</u>, <u>Bryant II</u> now controls this issue. We now hold on the authority of Bryant II that the reasonable doubt instruction given in defendant Williams' trial was free from error.

<u>Id.</u> at 12-13 (footnote omitted).

The instruction on reasonable doubt given during Petitioner's trial was consistent with

<u>Victor</u>. Therefore, the state court's determination was neither contrary to nor an unreasonable

application of Supreme Court precedent, and was not based upon an unreasonable determination of

the facts in light of the record before that Court. Accordingly, Respondent is entitled to summary

judgment on Claim V.

38

F. Claim VI

Petitioner asserts that he is "entitled to a new trial and sentencing hearing because the District

Attorney violated his State and Federal Constitutional rights by peremptorily challenging prospective

jurors solely on the basis of race during jury selection." Pet. [DE-9], pp. 28-29. The claim was

thoroughly addressed by the North Carolina Supreme Court as follows:

Defendant first contends the prosecutor violated his federal and state constitutional rights by using peremptory challenges to exclude black prospective jurors on the basis of their race and the trial court erred in overruling his objections to these challenges. The Equal Protection Clause of the Fourteenth Amendment and Article 1, § 26 of the North Carolina Constitution forbid the use of peremptory challenges in a racially discriminatory manner. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); State v. Crandell, 322 N.C. 487, 501, 369 S.E.2d 579, 587 (1988). Having carefully reviewed the record, and according the requisite deference to the trial court's rulings, we find this argument to be unpersuasive.

Counsel examined seventy jurors during jury selection including the selection of two alternates. Of the forty-three jurors not excused for cause or by consent, thirty-five were white, seven were black and one was Asian. The State peremptorily challenged eight whites, five blacks and the Asian. The State accepted two blacks and did not exhaust its peremptory challenges. Defendant struck fourteen whites and one black, leaving a jury composed of eleven whites and one black with two white alternates. Defendant interposed Batson objections to three of the State's five strikes against blacks. After each of these objections, the prosecutor volunteered an explanation for the strike in question without waiting for the trial judge to determine whether defendant had made out a prima facie case of purposeful discrimination. In each instance the trial judge overruled defendant's objection.

The prosecutor explained that he challenged one of the jurors because her "family's criminal involvement gives me some problems." He struck another, after having unsuccessfully lodged a challenge for cause, because of the juror's "answers to the capital punishment questions." The prosecutor struck the last juror because of inconsistencies between her answers on a written questionnaire and her answers on voir dire. He also explained that he thought her neighborhood had "a lot of drug activity," and that one of her previous residences, Alfa Arms, "for a long period of time has been a problem with the police."

The Court in Batson established a three-step process for evaluating claims of racial discrimination in the prosecutor's use of peremptory strikes. Hernandez v. New York,

39

500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 405 (1991). First, the defendant must establish a prima facie case that the prosecutor has peremptorily challenged prospective jurors on the basis of race. Id. Second, if such a showing is made, the burden shifts to the prosecutor to offer a racially-neutral explanation for each challenged strike. Id. To rebut the defendant's prima facie case, this neutral explanation must be " 'clear and reasonably specific' " and "related to the particular case to be tried." Batson, 476 U.S. at 98, n. 20, 106 S.Ct. at 1724, n. 20, 90 L.Ed.2d at 88–89, n. 20. Third, the trial court must determine whether the defendant has proven purposeful discrimination. Id. In North Carolina, the defendant may put on additional evidence before the trial court's final ruling to prove that the prosecutor's explanations are pretextual. State v. Green, 324 N.C. 238, 240, 376 S.E.2d 727, 728 (1989).

In the case at bar the prosecutor volunteered his explanations, and the trial court ruled that there was no purposeful discrimination. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866, 114 L.Ed.2d at 405. Thus, there is but one issue before us: Whether the trial court correctly determined that the prosecutor had not intentionally discriminated. State v. Thomas, 329 N.C. 423, 430–31, 407 S.E.2d 141, 147 (1991). Because the trial court was in the best position to assess the prosecutor's credibility, we will not overturn its determination absent clear error. Hernandez, 500 U.S. at 369, 111 S.Ct. at 1871–72, 114 L.Ed.2d at 412; see also Thomas, 329 N.C. at 433, 407 S.E.2d at 148 (clear error standard applicable to both federal and state constitutional claims).

That the prosecutor struck blacks because of their race is proved, defendant argues, by the following: (1) Since defendant is black and the victim was white, the prosecutor had incentive to keep blacks off the jury, (2) the prosecutor demonstrated racial animus by making numerous discriminatory comments, (3) the prosecutor did not apply the same disqualifying criteria to white as he did to black prospective jurors, (4) the explanation given by the prosecutor for striking one black juror was a proxy for race, and (5) the prosecutor used five of fourteen, or thirty-six percent, of his peremptory challenges on blacks, whereas blacks constituted only sixteen percent, seven of forty-three, of the jurors not challenged for cause. Of these arguments, only the last is supported by the record.

Defendant's argument that the prosecutor had incentive to strike blacks is self-defeating. The argument proceeds from the assumption that the prosecutor thought blacks more likely to identify with other blacks. Supposing this assumption to be true, it would have been illogical for the prosecutor to remove blacks as such inasmuch as the State's key witness, Angelo Farmer, was black. Farmer testified that

he originally conspired with defendant to break into Dewey Brothers to rob the company safe but that he backed out when he was later approached by defendant. Upon learning of the break-in and of Price's death, Farmer informed his supervisors and the police of his withdrawal from the plan with defendant and agreed to cooperate with the police investigation by wearing a hidden tape recorder during a conversation with defendant in order to obtain inculpatory statements. That a black witness played such a key role in defendant's prosecution substantially undercuts any incentive on the prosecutor's part to remove blacks on the basis of their race.

Defendant's assertion that the prosecutor made numerous discriminatory comments is unsupported by the record. During voir dire, the prosecutor routinely asked prospective jurors whether, given the "mixed racial composition" of the case to be tried, they could "put the issue of race completely out of [their minds]." According to defendant, that the prosecutor evidenced an awareness of the "racially-charged character of the case" raises an inference of discriminatory intent and suggests racial animus. Contrary to defendant's assertion, the record speaks for itself that the prosecutor asked this question, of both blacks and whites, to ensure that racially biased jurors would not be seated on the jury. The mere mention of race in a trial such as this is not evidence of racial animus.

Defendant also asserts that the prosecutor passed white prospective jurors who exhibited the same characteristics as blacks whom the prosecutor peremptorily challenged. The prosecutor struck one of the black jurors because of her family's involvement with crime, another because of inconsistent statements and a third because of the juror's views on the death penalty. According to defendant, the prosecutor passed two white jurors with criminal backgrounds, one white juror who made inconsistent statements and another who expressed reservations about imposing the death penalty.

Disparate treatment of prospective jurors is not necessarily dispositive on the issue of discriminatory intent. As the Court stated in State v. Porter :

> Choosing jurors, more art than science, involves a complex weighing of factors. Rarely will a single factor control the decision-making process.... "A characteristic deemed to be unfavorable in one prospective juror, and hence grounds for a peremptory challenge, may, in a second prospective juror, be outweighed by other, favorable characteristics."

326 N.C. 489, 501, 391 S.E.2d 144, 152–53 (1990) (quoting People v. Mack, 128 Ill.2d 231, 239, 131 Ill. Dec. 551, 555, 538 N.E.2d 1107, 1111 (1989), cert. denied, 493 U.S. 1093, 110 S.Ct. 1170, 107 L.Ed.2d 1072, reh'g denied, 494 U.S. 1092, 110

S.Ct. 1841, 108 L.Ed.2d 969 (1990)). Because the ultimate decision to accept or reject a given juror depends on consideration of many relevant characteristics, one or two characteristics between jurors will rarely be directly comparable.

Indeed, the white jurors passed by the prosecutor did not in fact exhibit characteristics comparable to those of the black jurors peremptorily challenged. Though it is true that two white jurors had been connected with crime—one had a brother in prison for child abuse, the other had pled guilty to misdemeanor drug charges—neither was as likely to harbor bias against the State as the black juror peremptorily challenged. That juror had one brother who had been charged with rape and convicted of a lesser charge, another brother who had been convicted of murder, and a son who had been convicted of assault. Though neither of the white jurors had ever sat through a criminal trial, the black juror had attended the trials of both her son and her brother convicted of murder. One of the white jurors recognized a police officer scheduled to testify against defendant as the same officer who had arrested her on drug charges. The black juror recognized the prosecutor; he had prosecuted her brother for murder. Thus, the prosecutor could reasonably have concluded that the black juror was more likely to be biased against the State than the white jurors in question.

One white juror indicated on his questionnaire that none of his immediate family was involved in law enforcement. On voir dire he explained that some more distant relatives were involved in law enforcement. These answers were not inconsistent. The black juror peremptorily challenged for inconsistent statements failed on voir dire to mention two of her jobs and incorrectly indicated that she owned her house.

Lastly, one white juror balked temporarily at the idea of pronouncing the death penalty in the presence of defendant, though she professed a belief that the death sentence should be imposed in appropriate cases. The black juror peremptorily challenged for his views on capital punishment opposed the death penalty and expressed doubt in his ability to vote for it even if it were merited by the evidence. Again, the prosecutor could reasonably have distinguished the black juror in question on the grounds he stated.

Defendant argues further that the prosecutor demonstrated a discriminatory intent when he struck one black juror in part because she lived in a "not very good neighborhood." Defendant contends this phrase was used as a euphemism for predominantly black, proving that the prosecutor did not want blacks on the jury. Though we recognize the potential for abuse inherent in the use of discriminatory strikes based upon residential address, the record here does not support such use.

When challenged by defendant at trial, the prosecutor explained his strike by alluding to the juror's inconsistent and misleading answers. According to the prosecutor, the

42

juror had falsely indicated on her questionnaire that she owned her house and had failed on voir dire to mention two of her recent employment positions. The prosecutor then stated that these discrepancies caused him concern, "particularly in light of the fact that ... South Virginia Avenue where she lives is just not [sic] very good neighborhood. That they have a lot of drug activity in that neighborhood and, of course, Alfa Arms is, for a long period of time has been a problem with the police." In rebuttal, defendant's counsel argued that inconsistent statements by other jurors had not been disqualifying. He also took issue with the prosecutor's reference to the juror's neighborhood, "particularly due to the fact that I live on Virginia Street in that very same neighborhood."

Relying on the above, defendant urges us to find that the prosecutor struck this juror because she lived in a predominantly black neighborhood. We cannot, of course, reach this conclusion without some evidence that the juror did in fact live in a black neighborhood. Though defendant's counsel appears to have thought she did, he did not specifically so state. Nor did he attempt to prove it, though he might easily have done so through testimonial or documentary evidence. The record shows only that two black people, the juror in question and one of defendant's attorneys, lived in the South Virginia Avenue area. We are left to speculate as to the race of other residents. Not knowing the racial composition of the juror's neighborhood, we cannot infer a discriminatory intent from the prosecutor's comment.

Assuming arguendo the juror in question did live in a black neighborhood, the prosecutor's explanation gives us no cause to doubt his motives. First, he articulated a reasonable, race-neutral reason for striking this juror, one supported by the record: That she had made misleading and inconsistent statements on voir dire. Second, his stated concern about her neighborhood was not its racial composition but rather its criminal activity. The record does not support the argument that the prosecutor's hunch about this juror was based on impermissible racial stereotypes.

We conclude, then, that the record supports only one fact in this case which may be considered evidence of defendant's claim of purposeful racial discrimination: The prosecutor's disproportionate use of peremptory strikes on blacks. See Hernandez, 500 U.S. at 363, 111 S.Ct. at 1868, 114 L.Ed.2d at 408 (disproportionate exclusion of members of given race may be considered evidence of discriminatory intent); see also Thomas, 329 N.C. at 431, 407 S.E.2d at 147. The prosecutor used thirty-six percent of his peremptory challenges on blacks, who made up only sixteen percent of the jury venire not challenged for cause. Notwithstanding, the trial court ruled the prosecutor had not peremptorily challenged blacks because of their race. In so ruling, the court could have considered that: The prosecutor's key witness was black, State v. Jackson, 322 N.C. 251, 255, 368 S.E.2d 838, 840 (1988), cert. denied, 490 U.S. 1110, 109 S.Ct. 3165, 104 L.Ed.2d 1027 (1989); the first juror accepted by the prosecutor was black, Thomas, 329 N.C. at 431, 407 S.E.2d at 147; the prosecutor

accepted two black jurors when he still had peremptory challenges available, Jackson, 322 N.C. at 255, 368 S.E.2d at 840; the prosecutor made no discriminatory comments, State v. Robbins, 319 N.C. 465, 493, 356 S.E.2d 279, 296, cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); and the prosecutor volunteered his explanations when defendant raised Batson objections, Hernandez, 500 U.S. at 369, 111 S.Ct. at 1871–72, 114 L.Ed.2d at 412. Thus, though there is some evidence that the prosecutor exercised his peremptory challenges in a racially discriminatory manner, there is also substantial evidence to the contrary. We hold, therefore, that the trial court's ruling was not clearly erroneous. As we have stated: "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." Thomas, 329 N.C. at 433, 407 S.E.2d at 148 (quoting Hernandez, 500 U.S. at 369, 111 S.Ct. at 1871–72, 114 L.Ed.2d at 412).

Williams, 339 N.C. at 15-21, 452 S.E. 2d at 254-57.

As noted by the state court, in Batson the Supreme Court held that the use of peremptory challenges on the basis of race gives rise to a claim of racial discrimination in violation of the Fourteenth Amendment. 476 U.S. at 96-97. In order to prove a Batson violation, a defendant must first establish a *prima facie* case of discrimination by showing facts which give rise to an inference that the prosecutor exercised peremptory challenges in a racially discriminatory manner. Id. at 96-97. If the defendant makes a *prima facie* showing, the burden shifts to the State to come forward with a race-neutral explanation. Id. at 97. The prosecutor must then "give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." Id. at 98 n.20 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258 (1981)). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral," since a legitimate reason need not be persuasive, plausible or even make sense. Purkett v. Elem, 514 U.S. 765,767-68 (1995) (per curiam). It must simply be "a reason that does not deny equal protection." Id. at 768. Once the prosecutor articulates a race-neutral explanation, the trial court must then decide whether the defendant has proven purposeful discrimination. Batson, 476

44

U.S. at 98. Proper analysis of a Batson claim requires that a court engage in comparative juror analysis. Miller-el v. Dretke, 545 U.S. 231, 241 (2005).

The party opposing a peremptory challenge always bears the burden of persuading the reviewing court of the supposed discriminatory basis for a peremptory challenge. Rice v. Collins, 546 U.S. 333, 339 (2006) (quoting Purkett, 514 U.S. at 768) ("'[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'"). The trial court's ruling is largely a credibility determination and should be given great deference. Batson, 476 U.S. at 98 n.21. "Thus, a finding of no discrimination is a factual finding that [is reviewed] for clear error." Golphin v. Branker, 519 F.3d 168, 179 (4th Cir. 2008) (citing Hernandez v. New York, 500 U.S. 352, 364-65 (1991)). Moreover, to grant relief based on a state court's determination at the third step of the Batson analysis, "a federal habeas court must find the state-court conclusion to be 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' " Rice v. Collins, 546 U.S. 333, 338 (2006) (quoting 28 U.S.C. § 2254(d)(2)). In addition, under 28 U.S.C. § 2254(e)(1), the determination is "presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. at 338–39. Indeed, the Supreme Court has noted in another case dealing with habeas review of a Batson claim that "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, _ U.S. _, 131 S.Ct. 1305, 1307 (2011) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

Here, the North Carolina Supreme Court correctly applied Batson and its progeny in rejecting Petitioner's claim, conducting a thorough analysis regarding whether Petitioner had proven

45

purposeful discrimination. Williams, 339 N.C. at 15-21, 452 S.E. 2d at 254-57. This discussion included a detailed comparative juror analysis. Id. Its ultimate determination that the prosecutor was not purposefully discriminating with his peremptory challenges was reasonable based on the record before it. Thus, this claim, as originally presented, is without merit.

However, when he supplemented his Petition on December 13, 2012, Petitioner buttressed this claim with additional statistical evidence. Pet'r. Mem. [DE-57], pp. 24-27. Specifically, Petitioner noted that he filed a MAR pursuant to the North Carolina Racial Justice Act ("RJA")[5], N.C. Gen. Stat. § 15A-2010, *et seq*, on August 10, 2010. Id. at p. 24. The RJA MAR allegedly "presented detailed statistical evidence and analysis relating to, *inter alia*, racial disparities in prosecutors' use of peremptory strikes in North Carolina capital cases between 1990 and 2010." Id. Petitioner summarized this statistical evidence as follows:

[Between 1990 and 2010] During that period of time [a] study found that North Carolina prosecutors struck 52.5% of all qualified black prospective jurors from capital jury service, while striking only 25.8% of qualified non-black prospective jurors . . . The State's practice of exercising peremptory strikes based on race was even more pronounced in capital cases with black defendants like Mr. Williams: in those cases, prosecutors struck qualified black prospective jurors 59.9% of the time while only striking non-black prospective jurors 23.1% of the time . . .

At the local level, these disparities were even worse: In capital cases tried in the Eighth Prosecutorial District (which is comprised of Lenoir, Greene and Wayne Counties), prosecutors "struck qualified black venire members at an average rate of 61.6% but struck qualified non-black venire members at an average rate of only 22%." . . . Worse, in capital cases tried in Wayne County, prosecutors "struck qualified black venire members at an average rate of 63.9% but struck qualified non-black venire members at an average rate of only 20.4%." . . . In other words, "prosecutors were 3.1 times more likely to strike qualified venire members who were black." . . .

_____

[5] The RJA has since been repealed. 2013 North Carolina Laws S.L. 2013-154 (S.B. 306).

The prosecution's use of peremptory strikes in Mr. Williams's own case was certainly consistent with this pattern: Prosecutors struck qualified black venire members at an average rate of 71.4% but struck qualified non-black venire members at an average rate of 25%.

Id. at pp. 24-26.

Statistical evidence is properly a matter of consideration for a court undertaking a Batson analysis. See Miller–El, 537 U.S. at 331; Golphin, 519 F.3d at187. Here, however, the statistical evidence presented by Petitioner is insufficient to overcome the "benefit of the doubt" that must be given to the state court's findings of fact. Felkner, 131 S.Ct. at 1307; Renico, 559 U.S. at 773. Likewise, Petitioner's statistical evidence is insufficient to show that the North Carolina Supreme Court unreasonably applied federal law. Golphin, 519 F.3d at 187 (finding no Batson violation where the prosecution struck 71% of eligible African–American jurors and explaining that "statistical evidence ... alone cannot carry the day"); Coulter v. McCann, 484 F.3d 459, 468 (7th Cir. 2007) (denying habeas relief under Batson where prosecution used ninety percent of its strikes against African-American jurors); Barnes v. Lassiter, No. 1:08-cv-00271, 2013 WL 1314466, at * 2 (M.D.N.C. March 28, 2013) (stating that "statistical evidence that 6 of 9(66%) eligible African–American jurors were struck in comparison to 10 of 54(19%) eligible white jurors is insufficient by itself to show that the Supreme Court of North Carolina unreasonably applied federal law"); Wiggins v. Jackson, No. 3:05-cv-346-1-MU, 2009 WL 484668, at * 6, n. 5 (W.D.N.C. Feb. 25, 2009) (rejecting Batson claim where prosecutor "had used peremptory challenges with seventy-three percent of otherwise qualified African–Americans compared with the thirteen percent rate at which the prosecution struck otherwise qualified white jurors").

In summary, the state court's rejection of Petitioner's Batson claim was neither contrary to

47

nor an unreasonable application of Supreme Court precedent, and was not based upon an unreasonable determination of the facts in light of the record before that Court. Accordingly, respondent is entitled to summary judgment on Claim VI.

G. Claim VII

Petitioner argues that "the prosecutor unconstitutionally injected race into the jury selection process by repeatedly drawing the jurors attention to the fact the defendant was a young black man and the victim was an elderly white man." Pet. [DE-9], p. 40. Specifically, Petitioner contends that "the prosecutor, over repeated objections, in jury voir dire raised the 'issue' of race over thirty times." Pet. [DE-9], p. 41. Petitioner correctly notes that during voir dire the prosecutor informed potential jurors that the case involved an elderly white victim and a young black defendant. Thereafter, the prosecutor consistently asked potential jurors whether they could "put the issue of race completely out of [their] mind." See, e.g. Resp't Ex. A1, pp. 70, 139, 144, 185, 186, 218, 254, 255, 283, 317, 318, 344, 345.

The North Carolina Supreme Court made the following findings regarding this claim:

Defendant . . . takes issue with the prosecutor's many references to race. According to defendant, the prosecutor deliberately injected racial prejudice into the proceedings by asking prospective jurors, over defendant's objection, whether they could "put the issue of race completely out of [their minds]," given the defendant was black and the victim white. Defendant argues that these questions drew attention to race for no justifiable purpose and therefore must have been intended to foment racial prejudice. Defendant argues in the alternative that, even if the prosecutor acted in good faith, his comments nevertheless impermissibly tainted the jury. We believe the questions were proper.

As an officer of the court, obligated to refrain from conduct which may deprive the defendant of a fair trial, the prosecutor may not make "statements calculated to engender prejudice or incite passion against the defendant." State v. Stamps, 569 S.W.2d 762, 767 (Mo. App. 1978); see also Miller v. North Carolina, 583 F.2d 701, 707 (4th Cir. 1978). Thus, overt appeals to racial prejudice, such as the use of racial

48

slurs, are clearly impermissible. See United States ex rel. Haynes v. McKendrick, 481 F.2d 152 (2nd Cir. 1973); State v. Wilson, 404 So. 2d 968 (1981). Nor may a prosecuting attorney emphasize race, even in neutral terms, gratuitously. See People v. Springs, 101 Mich.App. 118, 125, 300 N.W.2d 315, 318 (1980) (prosecutor's many references to the race of the parties and persons associated with them held prejudicial); People v. Brown, 170 Ill. App.3d 273, 283–84, 120 Ill. Dec. 712, 719, 524 N.E.2d 742, 749 (1988) (prosecutor's reference to victim as "this little black woman" improper since "there was no reason ... to refer in any way to the alleged victim's race").

Nonderogatory references to race are permissible, however, if material to issues in the trial and sufficiently justified to warrant "the risks inevitably taken when racial matters are injected into any important decision-making." McFarland v. Smith, 611 F.2d 414, 419 (2nd Cir. 1979). In Haynes, for instance, the Court condoned an argument by defense counsel attacking the eyewitness testimony of white witnesses on the ground that whites may have difficulty identifying with blacks. 481 F.2d at 160. Similarly, in State v. Chavis, 24 N.C.App. 148, 164–65, 210 S.E.2d 555, 567 (1974), appeal dismissed and disc. review denied, 287 N.C. 261, 214 S.E.2d 434 (1975), cert. denied, 423 U.S. 1080, 96 S.Ct. 868, 47 L.Ed.2d 91 (1976), our Court of Appeals approved a prosecutor's reference to race for purposes of identification.

The prosecutor's questions in the case at bar clearly satisfy the test outlined above. They were nonderogatory references to race made for a legitimate reason: To ensure that racially biased prospective jurors were not seated on the jury. As the U.S. Supreme Court noted in Turner v. Murray, 476 U.S. 28, 35, 106 S.Ct. 1683, 1687–88, 90 L.Ed.2d 27, 35 (1986), inquiring into racial bias is especially important in capital trials: "Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected." Nor was there an appreciable risk that the prosecutor's mere mention of the race of the parties would engender prejudice. The prosecutor did not harp on race with any individual juror, nor is it alleged that he appealed to prejudice by his tone of voice or demeanor. Rather, in every instance he made a straightforward inquiry whether prospective jurors could judge defendant without bias, and he followed with an admonition that it was their duty to do so. We conclude his questions did not violate defendant's right to a fair trial and were properly permitted by the trial court.

Williams, 339 N.C. at 23-25, 452 S.E. 2d at 259-61.

A "trial court retains great latitude in deciding what questions should be asked on voir dire."

Mu'Min v. Virginia, 500 U.S. 415, 424 (1991). Moreover, "a capital defendant accused of an

49

interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." Turner, 476 U.S. at 36–37. The prosecutor's voir dire questioning was specifically designed to ensure that prospective jurors were not racially biased.

In summary, the state court's rejection of this claim was neither contrary to nor an unreasonable application of Supreme Court precedent, and was not based upon an unreasonable determination of the facts in light of the record before that Court. Accordingly, Respondent is entitled to summary judgment on Claim VII.

H. Claim VIII

Petitioner asserts that "[t]he District Attorney systematically exercised peremptory challenges against all jurors who expressed even the slightest reservation concerning the death penalty and argued its case during voir dire by repetitively stressing the juror's 'duty' to vote for the death penalty." Pet. [DE-9], p. 43. The following is illustrative of the prosecutor's examination of potential jurors on the issue of the death penalty:

Q. [D]o you believe in the death penalty?
. . .
Q. Do you believe in the death penalty in first degree murder?
. . .
Q. In first degree murder, do you understand that it is not an automatic thing? It is a weighing of the facts and circumstances in the case under instructions as to, as to the law; do you understand that?
. . .
Q. You will be required to consider aggravating factors and mitigating factors and balance them and say whether or not you find the case merits life or death; do you understand that?
. . .
Q. Would you have any problem fulfilling that duty?
. . .
Q. Would you have any predisposition now as you sit in the jury that you would be inclined to go one way or the other without ever hearing any facts?
. . .

50

Q. You have no predisposition right now or preference for life or death on any particular case [?]

. . .

Q. You as a juror would be required to sit in the course of this trial and if you and the others [determined] that the appropriate verdict beyond a reasonable doubt was death . . . do you feel . . . that you wold have the stamina to do that very thing, facing him in this courtroom if you found it your duty to return such a verdict beyond a reasonable doubt?

Resp't. Ex. A1, pp. 65-68.

The North Carolina Supreme Court made the following findings regarding this claim:

In his next assignment of error, defendant contends the trial court erred in permitting the prosecutor to engineer a jury predisposed to voting for the death penalty. According to defendant, the prosecutor exercised peremptory challenges to exclude prospective jurors who expressed any reservation about imposing the death penalty and also indoctrinated prospective jurors by suggesting they would have a duty to vote for the death penalty, all in violation of defendant's rights under the North Carolina Constitution and under the Sixth and Fourteenth Amendments. Defendant's arguments are again unpersuasive.

The prosecutor peremptorily challenged six prospective jurors because of their views on the death penalty, five of whom he had unsuccessfully challenged for cause under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, reh'g denied, 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968), and its progeny. Defendant contends the prosecutor should not have been permitted to peremptorily challenge jurors not excludable for cause under Witherspoon. We consistently have rejected this argument, holding that a prosecutor may exercise peremptory challenges to exclude jurors who express qualms about the death penalty, even though those jurors are not excludable for cause, without violating either the North Carolina or the United States Constitutions. State v. Brogden, 329 N.C. 534, 547, 407 S.E.2d 158, 166 (1991); see also State v. Allen, 323 N.C. 208, 222, 372 S.E.2d 855, 863 (1988), judgment vacated on other grounds, 494 U.S. 1021, 110 S.Ct. 1463, 108 L.Ed.2d 601 (1990). We decline to reconsider these holdings.

Defendant also contends the prosecutor attempted on voir dire to "stack the deck" against him by influencing prospective jurors to vote for the death penalty. According to defendant, questions of the following type were intended to make prospective jurors believe they had a duty to return the death penalty: "So you are telling me that if you were convinced beyond a reasonable doubt that [the death penalty] was the

51

proper punishment, that you ... could do your duty and do that very thing?" Defendant also points to questions by the prosecutor as to whether jurors were "strong enough" to vote for the death penalty. By such questions, defendant contends, the prosecutor implied that only the weak would vote for life imprisonment.

While it is true that counsel may not argue their cases on voir dire, State v. Leroux, 326 N.C. 368, 384, 390 S.E.2d 314, 325, cert. denied, 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 155 (1990), or attempt to indoctrinate prospective jurors, State v. Phillips, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980), the prosecutor cannot be said to have done either. First, his questions were clearly designed to ascertain whether prospective jurors' views on the death penalty would prevent them from faithfully following the death penalty statute, thus making them excludable for cause. Under N.C.G.S. § 15A–1212(8), a juror who is "unable to render a verdict with respect to the charge in accordance with the law" may be challenged for cause. Thus, the prosecutor's questions were appropriate. See State v. Smith, 328 N.C. 99, 130, 400 S.E.2d 712, 729 (1991) (questions whether jurors were "strong enough to recommend the death penalty" proper since intended to determine whether challenge for cause appropriate under N.C.G.S. § 15A–1212(8)).

Second, contrary to defendant's contentions, the prosecutor appears to have taken pains to avoid making any suggestion that prospective jurors would be obligated to vote for the death penalty. In death-qualifying prospective jurors, the prosecutor consistently asked whether they would be willing to vote for the death penalty if they found the punishment warranted by the evidence and the law, the conditional phrasing of the question clearly indicating that the jury might find the death penalty not to be so warranted. Indeed, in most instances the prosecutor candidly emphasized that the defendant must be considered innocent until proven guilty, that the State would have the burden of proving the defendant's guilt and that, in the sentencing phase, "if it ever comes and it may not," the jurors could not even consider the death penalty unless they found that there were aggravating factors not outweighed by mitigating factors. Furthermore, as the prosecutor described the jurors' "duty" it was to render a verdict in accordance with the law, not to vote for the death penalty. For these reasons, we hold that the trial court did not abuse its discretion in allowing the prosecutor's questions.

Williams, 339 N.C. at 21-23, 452 S.E. 2d at 257-259.

In Witherspoon v. Illinois, 391 U.S. 510 (1968), the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed

conscientious or religious scruples against its infliction." Witherspoon, 391 U.S. at 522. Likewise, "'a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 419 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). However, the prosecution "'may insist . . . that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the Court.'" Id. (quoting Adams, 448 U.S. at 45). Accordingly, a prospective juror in a capital case "must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to [render a verdict] without conscious distortion or bias." Adams, 448 U.S. at 46. The prosecution "does not violate the Witherspoon doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality." Id. Whether a venire member's reservations concerning the death penalty amount to a " 'substantial impairment' is perforce committed in the first instance to trial court discretion based upon the voir dire inquiry." United States v. Tipton, 90 F.3d 861, 880 (4th Cir. 1996). "[W]hat is being inquired into is a state of mind whose determination turns largely on assessments of demeanor and credibility, matters peculiarly within the province of trial judges ...." Id. Similarly, a trial court's jury selection procedures are not constitutionally mandated but are left to the trial court's discretion. See Ristaino v. Ross, 424 U.S. 589, 594–95 (1976). "[A]bsent 'special circumstances' that create a particularly compelling need to inquire into ... prejudice, the Constitution leaves the conduct of voir dire to the sound discretion of trial judges." Turner, 476 U.S. at 38, n. 12. A "generalized but thorough inquiry into the impartiality of the veniremen" is constitutionally sufficient. Ristaino, 424 U.S. at 598. Finally, the Fourth Circuit has held that "a state may use its peremptory challenges to purge a jury

53

of veniremen not excludible for cause under <u>Witherspoon</u>." <u>Brown v. Dixon</u>, 891 F.2d 490, 497 (4th Cir. 1989).

The North Carolina Supreme Court correctly applied these principles when it rejected this claim. Therefore, the state court's rejection of this claim was neither contrary to nor an unreasonable application of Supreme Court precedent, and was not based upon an unreasonable determination of the facts in light of the record before that Court. Accordingly, Respondent is entitled to summary judgment regarding on Claim VIII.

I. Claim IX

Petitioner argues that the trial court erred when it denied Petitioner's motion to suppress evidence obtained as in violation of the Petitioner's Fifth Amendment right against self-incrimination. Pet. [DE-9], p. 51. Specifically, Petitioner contends:

> [Petitioner] moved to suppress a statement attributed to him and physical evidence identified and seized as a result of the statement, on the ground that the defendant had indicated after being Mirandized that he wished to remain silent. The evidence seized was used to link the defendant to the commission of the crime. The trial court erroneously held that defendant had waived his right to remain silent, and denied the supression motion.
> . . .
>
> At the time of his arrest Marvin Williams was wearing a pair of tennis shoes which were seized [Resp't. Ex. A4, p. 746], and on which an officer testified was a white substance appearing to be liquid shoe polish [Resp't Ex. A3, p. 501]. The shoes were compared to shoeprints photographed at the scene [Resp't. Ex. A2, p. 263; Resp't Ex. A3, pp. 436-450], and an SBI technician testified that the prints were made by the shoes [Resp't. Ex. A5, pp. 1092,1101]. This was the only physical evidence linking petitioner to the crime scene, but no blood from the crime scene was found on the shoes. [Resp't. Ex. A4, p. 910]. The state sought to connect the defendant to liquid shoe polish seized from a rooming house at the time of arrest as a way of explaining the lack of blood on the shoes. To do so the state sought to admit a statement it contended defendant made acknowledging ownership of the box in which the polish was found, and which was seized because of the statement.

54

Petitioner moved to suppress the statement and the evidence [Id. at pp. 716-37]. At the suppression hearing the state's evidence was that at arrest with the defendant in custody the defendant was advised of his Miranda rights including his right to remain silent, that the officer then asked defendant if he understood the rights, to which the defendant responded orally "yes", and the defendant was then immediately asked, twice, if he wished to answer questions, to which successive inquiries the defendant stood mute. Immediately after and despite the defendant's having exercised the right to remain silent, the officer then asked defendant if the boxes there in the room were his, to which the defendant replied yes. [Id. at pp.719-21].

The trial court found that "the defendant's failure to respond [to the questions of whether he would answer questions] is deemed to be an oral waiver of his right against self-incrimination." [Resp't Ex. B, pp. 54-55; Resp't. Ex. A4, pp.736-37].

Id. at pp. 51-53.

The North Carolina Supreme Court made the following findings with regard to this claim:

Defendant contends, finally, that the trial court erred in denying his motion to suppress statements he made at his arrest and physical evidence seized during a search incident to that arrest. According to defendant, the statements should have been suppressed because obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); the physical evidence should have been excluded because a fruit of the illegally obtained statements. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We believe the trial court properly denied defendant's motion.

At the suppression hearing, Officer Sullivan testified as follows. Pursuant to warrants for murder and attempted safe-cracking, he arrested defendant at a boarding house called the Salem Lodge, in the room of one Mr. Artis. Upon placing defendant in custody, he informed him of his Miranda rights and asked whether he understood those rights. Defendant responded, "yes." He then asked defendant, first, whether he wished to waive his right to remain silent, and then, whether he wished to waive his right to have counsel present during questioning. Defendant stood mute at each of these questions, making no response whatsoever. Soon thereafter, someone behind Sullivan asked defendant whether anything in the room belonged to him. Defendant responded that he owned the boxes (located on the floor). Sullivan then asked defendant whether he would consent to a search of the boxes, to which defendant responded, "yes." The boxes, containing clothing and other personal effects, were searched for weapons and then removed to the police station.

Sullivan testified further that there were four officers at the scene of the arrest, two in the room and two at the door; that neither promises, nor threats, nor trickery were

55

used to elicit defendant's statements; that defendant appeared to be coherent; and that defendant did not appear to be under the influence of drugs or alcohol.

Crediting this testimony, and discounting defendant's testimony to the contrary, the trial court found as fact that defendant had been read his rights, that he did not respond to Sullivan's questions regarding waiver but thereafter indicated he owned the boxes and consented to having them searched, that he made these statements free from coercion or inducement and while coherent, and that he understood his rights. Based on these findings, the trial court held defendant's statements admissible, concluding that he had "freely, knowingly, intelligently, and voluntarily" waived his rights to remain silent and to counsel. The trial court also held the boxes admissible because seized incident to a lawful arrest; it thereupon denied defendant's motion to suppress.

Defendant does not take issue with the trial court's findings of fact. He challenges instead the court's conclusion of law that he knowingly and voluntarily waived his Miranda rights. According to defendant, waiver cannot be inferred from his conduct at the arrest since he "never said or did anything ... to indicate he had waived his rights." To the contrary, however, defendant answered the officers' questions free from coercion and after indicating that he understood his rights. These facts are sufficient to justify the trial court's ruling that he impliedly waived his rights.

North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), established that waiver of Miranda rights may be either express or implied. In that case, the defendant was advised of his Miranda rights and indicated that he understood those rights. He refused, however, to sign a written waiver, stating: "'I will talk to you but I am not signing any form.'" He then made incriminating statements. Id. at 371, 99 S.Ct. at 1756, 60 L.Ed.2d at 291. Overruling the North Carolina Supreme Court's holding that the defendant's waiver was invalid because not "specifically made," the Court held that an express written or oral statement of waiver was "not inevitably either necessary or sufficient to establish waiver." 441 U.S. at 373, 99 S.Ct. at 1757, 60 L.Ed.2d at 292.

As the Court explained:

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights.... [I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

Id.

Following the lead of Butler, this Court has consistently held that a defendant may validly waive his Miranda rights by answering questions from the police, even though he has initially refused to expressly waive his rights. In State v. Connley, 297 N.C. 584, 256 S.E.2d 234, cert. denied, 444 U.S. 954, 100 S.Ct. 433, 62 L.Ed.2d 327 (1979), the defendant stated after reading an Advice of Rights form, "'I know what it says and I understand, but I'm not going to sign it.'" He then answered questions for a short time, ignoring some questions and terminating the interview by asking for a lawyer. Id., 297 N.C. at 586-88, 256 S.E.2d at 236. On these facts, we held that the defendant had impliedly waived his Miranda rights. Id. at 588-89, 256 S.E.2d at 237. Similarly, in State v. Vickers, 306 N.C. 90, 291 S.E.2d 599 (1982), we found a valid waiver where the defendant did not expressly waive his rights but rather indicated that he understood them and then answered questions "during a general conversation that occurred on the way to the jail." Id. at 92, 96, 291 S.E.2d at 602, 604.

In both of these cases, the critical facts supporting waiver were: 1) that the defendant demonstrated an understanding of his rights, and 2) that the questioner exerted no pressure on the defendant to answer questions, whether by way of coercion, intimidation or trickery. Connley, 297 N.C. at 588-89, 256 S.E.2d at 237; Vickers, 306 N.C. at 96, 291 S.E.2d at 604. These facts obtain equally in the case at bar. First, though defendant remained silent when asked if he would waive his rights, he did affirmatively state that he understood his rights. He appeared coherent at the time and was, as the trial court also found, "capable of understanding his rights." Second, the police did not pressure him in any way to answer their questions. Thus, we can infer that in answering the officers' questions after expressly acknowledging that he understood his right not to do so in the absence of counsel, defendant impliedly waived his rights to remain silent and to counsel.

Since defendant's statements were legally obtained, the seizure of the boxes he identified as belonging to him, otherwise legal, was not tainted. We conclude that the trial court properly admitted defendant's statements and his boxes.

This assignment of error is overruled.

Williams, 334 N.C. at 462-65, 434 S.E.2d at 601-03.

The Supreme Court has recently held that "a witness does not [invoke the privilege against

self-incrimination] by simply standing mute." Salinas v. Texas, _ U.S. _, 133 S. Ct. 2174, 2178 (2013). See also, Berghuis v. Thompkins, 560 U.S. 370, 130 S. Ct. 2250, 2259-60 (2010) (rejecting argument that defendant "invoked his privilege to remain silent by not saying anything for a sufficient period of time.") (internal quotation and alteration omitted)). Therefore, the state court's rejection of this claim was neither contrary to nor an unreasonable application of Supreme Court precedent, and was not based upon an unreasonable determination of the facts in light of the record before that Court. Accordingly, Respondent is entitled to summary judgment on Claim IX.

J. Claim XIV

As noted above, Petitioner's July 3, 1996 MAR was summarily denied without a hearing on May 22, 1997. Resp't. Ex. O. He then petitioned the North Carolina Supreme Court for certiorari review and this was denied. Resp't. Ex. R. On November 16, 1999, the United States Supreme Court denied certiorari review. Resp't. Ex. U. Petitioner now argues that "[b]asic federal due process as well as the state statute required that defendant be afforded an opportunity to present evidence relevant to the fact issues and argument as to the legal issues [raised in the July 3, 1996 MAR]." Pet. [DE-9], p. 61. Section 15A-1420(c)(1) of the North Carolina General Statutes states "[a]ny party is entitled to a hearing on questions of law or fact arising from the motion and any supporting or opposing information presented *unless the court determines that the motion is without merit*." (emphasis added). Therefore, the Fourth Circuit found no due process violation when a MAR petitioner was denied a hearing, because "nothing in [North Carolina's] statute setting forth procedures for consideration of motions for appropriate relief mandates the holding of an evidentiary hearing in all cases." Ward v. French, 165 F.3d 22 (4th Cir. 1998) (unpublished opinion), cert. denied, 526 U.S. 1124. Moreover, claims based on state court rulings are cognizable on federal

58

habeas review only when they violate specific constitutional provisions or are so egregious as to render the entire trial fundamentally unfair, thus violating the Due Process Clause of the Fourteenth Amendment. Estelle, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Petitioner has not demonstrated that he was denied due process because his MAR was summarily denied without a hearing.

Therefore, the state court's decision to not conduct a hearing on Petitioner's July 3, 1996 MAR was neither contrary to nor an unreasonable application of Supreme Court precedent, and was not based upon an unreasonable determination of the facts in light of the record before that Court. Accordingly, Respondent is entitled to summary judgment on Claim XIV.

IV.    Certificate of Appealability

Having determined that respondent is entitled to summary judgment and the petition is due to be dismissed, the court must now consider whether Petitioner is entitled to a certificate of appealability. See Rule 11 of the Rules Governing Section 2254 Cases ("Habeas Rules") ("the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). An applicant satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court likewise is debatable. See Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000); Rose, 252 F.3d at 683-84.

After reviewing the petition in light of the applicable standards, the court finds that reasonable jurists would find the court's treatment of Claim IV(A) of the petition debatable and that

59

issue is adequate to deserve encouragement to proceed further. Accordingly, Petitioner is entitled to a certificate of appealability as to Claim IV(A). However, the court finds that reasonable jurists would not find the court's treatment of Petitioner's remaining claims debatable or wrong and that none of the remaining issues are adequate to deserve encouragement to proceed further. Accordingly, Petitioner is not entitled to a certificate of appealability regarding any of his other claims.

## CONCLUSION

For the foregoing reasons, Respondent's motion for summary judgment [DE-10] is ALLOWED and the petition [DE-9] is DISMISSED. The court GRANTS a certificate of appealability as to Claim IV(A), and DENIES a certificate of appealability regarding all other claims. The Clerk of Court is DIRECTED to close this case.

SO ORDERED. This the 27 day of September, 2013.

_____
JAMES C. FOX
Senior United States District Judge

60